STATE of Alaska, Legislative Council of the State of Alaska, Legislative Affairs Agency of the State of Alaska, Myrton Charney, Executive Director of the Legislative Affairs Agency, and Gregg Erickson, Director of Division of Research of the Legislative Affairs Agency, Appellants and Cross-Appellees,

v.

Sharman HALEY, Appellee and Cross-Appellant.

Nos. 6604, 6608–6610.

Supreme Court of Alaska.

Aug. 10, 1984.

---

Arthur H. Peterson, Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for appellant/cross-appellee, State of Alaska.

Phillip J. Eide, Ely, Guess & Rudd, Anchorage, for appellants/cross-appellees, Legislative Council and Legislative Affairs Agency.

W.G. Ruddy, Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellants/cross-appellees, Charney and Erickson.

William T. Council, Thomas E. Wagner, Juneau, for appellee/cross-appellant, Haley.

Before BURKE, C.J., RABINOWITZ and MATTHEWS, JJ., and SOUTER,* Superior Court Judge.

## OPINION

MATTHEWS, Justice.

This appeal and cross-appeal arise out of the termination of Sharman Haley from her position as a legislative researcher for the Legislative Affairs Agency. The dismissal followed a television interview in which Haley expressed her views on multinational corporations in Alaska. She alleges that the dismissal violated her right of free expression and gave rise to remedies against the responsible state officials and the State.

---

* Souter, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

The Legislative Affairs Agency was established by the Legislative Council, a permanent interim committee, to assist it in providing the legislature with research on and analysis of proposed legislation as well as other general administrative services. AS 24.20.010. Haley and approximately thirteen other legislative researchers were employed by the Research Division of the Legislative Affairs Agency. Their duties generally included performing statistical and economic-impact analyses of proposed legislation, detailing the merits and public policy implications of proposed legislation, making drafting suggestions, and proposing alternative means for achieving desired results.

In order to promote the confidence of legislators using these services, the Legislative Council claims to have imposed on all legislative researchers a prohibition against public comment on issues before or likely to come before the legislature. This alleged "public neutrality requirement" was not a well defined regulation, but rather was an unwritten and informal understanding among persons within the Research Division. The Director of the Research Division, Gregg Erickson, believed that such a requirement could be derived from AS 24.20.050, which provides that "members of the professional staff shall ... [refrain] from joining or supporting any partisan political organization, faction or activity which would tend to undermine the essential nonpartisan nature of their functions and services." The precise contours of the public neutrality requirement were determined through the ad hoc judgment of Erickson as questions arose.

On March 25, 1979, Haley informed Erickson that she planned to attend a symposium on multinational corporations sponsored by Alaskans for Democratic Resource Management and Common Ground Collective. Erickson apparently warned her that her participation in the symposium was "sailing on troubled waters." Nevertheless, on the following day Haley participated in the symposium and on the day after that she attended a demonstration on the steps of the Capitol Building in Juneau to protest the increasing influence of multinational corporations in Alaska. At the demonstration, Haley granted an interview with a television reporter and expressed her views as follows:

HALEY: A multinational corporation is any corporation that operates in more than one country, and they get very large, and because they operate in several countries they can shuffle profits from one subsidiary to another to avoid taxes or other kinds of legal restrictions in one country. They can also shuffle jobs in and out of countries. For instance, in the fish processing industry in Alaska, a lot of the fish processing is done by Japanese multinational corporations on Alaska fish and then they sell the fish right back to the United States. Over 600,000 metric tons of bottomfish were caught in Alaska, processed by the Japanese and sold back to the U.S. last year.

INTERVIEWER: What do you hope will come out of this? Are you hoping to get multinationals out of the state? Are you hoping to, I assume, impact the legislature, or what?

HALEY: It is a double tiered push. First of all, there are a lot of things we can do right now to defend our interest, such as raising taxes on multinationals, cutting off our lease sales until we have surveyed the oil and gas lands better so that we know how much they are worth to get a better deal in the terms we negotiate in our leases. We can prohibit the export of round logs. We can use state money to help set up fish processing cooperatives around the state so that we have the capacity for processing our bottomfish on-shore. But in the long run, those are just defensive maneuvers and what we really have to be looking for is a way to get rid of the multinational corporations altogether and turning our own productive resources to the use of our own people.

INTERVIEWER: You're saying the state should then possibly be in the business of oil and gas, for instance?

HALEY: Yes, I think that is a good idea for the state to set up a vertically integrated oil company to develop and process Alaska's oil itself. Right now multinational corporations, as all corporations, operate on a profit motive, and if they can get cheaper labor somewhere else, they will move the processing or labor intensive steps of the process to places where the labor is cheaper. But we know in Alaska that profits are not the only important thing. People need jobs, people need a stable economy, and people also want things like a clean and healthy working environment. People want things like the survival of indigenous cultures. These are other values that we need to bring into the economic decision-making process. And it won't be done by multinational corporations.

Later, a newspaper article quoted Haley's opinions.

On March 28, 1979, Erickson confronted Haley and stated that, in his opinion, she had violated the public neutrality requirement. He arranged a meeting with her to discuss the problem. At the meeting, Erickson agreed not to terminate Haley if she would accept a reprimand and abide by his interpretation of the public neutrality requirement in the future. He also encouraged her to assist him in drafting a written statement of the policy.

Haley declined to accept the reprimand and refused to abide by Erickson's interpretation of the public neutrality requirement in the future. Although she had drafted a written interpretation of the public neutrality requirement that she felt was acceptable, she did not present it to Erickson because she believed he would not agree to accept her interpretation as agency policy. She subsequently took the position that she could not be prohibited from publicly expressing her views as long as

they did not support a particular political party. When Haley would not agree to refrain from making public statements concerning non-party issues before or likely to come before the legislature, Erickson terminated her.

Haley appealed Erickson's decision to Myrton Charney, Executive Director of the Legislative Affairs Agency. Charney upheld the termination.

Haley then appealed to the Legislative Council. As an exempt employee, AS 39.-25.110(5) (amended 1982), she had no statutory right to a hearing before the Council, and she was not granted one. However, on or about May 7, 1979, the Legislative Council overturned Erickson's decision to terminate Haley, awarded her back pay, and then terminated her as an action of the Legislative Council.

Haley brought suit in superior court against the State, the Legislative Council, the Legislative Affairs Agency (hereinafter collectively referred to as "the State"), and against Charney and Erickson. Her original complaint, filed May 10, 1979, sought back pay, reinstatement, and declaratory relief in the form of an order stating that her discharge was illegal. She also alleged that Charney and Erickson were liable to her pursuant to 42 U.S.C. § 1983.[1]

On December 31, 1980, the superior court, Judge Stewart presiding, entered an order of partial summary judgment. The court concluded that Haley's termination violated her rights to free speech and assembly and was therefore illegal; that the doctrine of sovereign immunity did not bar her suit against the State; and that Charney and Erickson had acted in good faith in terminating Haley and were therefore entitled to an order of dismissal. The court later reconsidered its ruling with respect to Charney and Erickson and determined that

---

1. 42 U.S.C. § 1983 (Supp.V 1981) provides in relevant part:

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

the issue of their good faith was a question of fact for the jury.

After trial a jury found that Charney and Erickson had acted in good faith; that Haley had reasonably mitigated her damages to the extent of $15,000; and that although she had suffered mental and emotional distress, she was not entitled to an award on that basis.

The court entered judgment on December 4, 1981, awarding Haley back pay and benefits, interest, costs and attorney's fees. In addition, it ordered Haley reinstated to a legislative research analyst position with an agency of the legislature. The court dismissed the § 1983 action against Charney and Erickson.

I

The parties raise several issues on appeal concerning various governmental immunities and the propriety of certain awarded remedies. However, we first consider whether Haley's termination violated her constitutional rights, since these other issues need not be reached unless we conclude that a violation has occurred. Haley's primary argument is that, under the first amendment to the United States Constitution and article I, section 5 of the Alaska Constitution, her termination was illegal.[2]

*Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), is the seminal case on termination of public employees for their exercise of first amendment rights. In *Pickering*, the Board of Education of Will County, Illinois, dismissed a teacher for writing a letter critical of the School Board which was subsequently published in a local newspaper. The Court stated:

"[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." At the same time it cannot be

gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

391 U.S. at 568, 88 S.Ct. at 1734, 20 L.Ed.2d at 817 (citation omitted). To give guidance to courts in applying this balancing test, the Court suggested a consideration of the following factors: (1) maintenance of discipline by immediate superiors; (2) preservation of harmony among co-workers; (3) maintenance of personal loyalty and confidence when necessary to the proper functioning of a close working relationship; (4) maintenance of the employee's proper performance of daily duties; (5) public impact of the statement; (6) impact of the statement on the operation of the governmental entity; and (7) existence or nonexistence of an issue of legitimate public concern. 391 U.S. at 569–73, 88 S.Ct. at 1735–37, 20 L.Ed.2d at 818–20. The Court placed on the School Board the burden of showing that Pickering's letter actually threatened the school's operations by hindering the raising of revenue or the maintenance of discipline. The Court sustained Pickering's first amendment claim because the School Board failed to show that the letter would have had any impact on the actual operation of the school, other than its tendency to anger the Board members. 391 U.S. at 571, 88 S.Ct. at 1736, 20 L.Ed.2d at 818–19. In reaching this conclusion the Court noted that the case presented no problem of maintaining discipline or harmony among co-workers. 391 U.S. at 570, 88 S.Ct. at 1735, 20 L.Ed.2d at 818.

2. U.S. Const. amend. I provides in relevant part: Congress shall make no law ... abridging the freedom of speech ....
Alaska Const. art. I, § 5 provides:

Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

*City & Borough of Sitka v. Swanner,* 649 P.2d 940 (Alaska 1982), is this court's most recent pronouncement on termination of public employees for their exercise of first amendment rights. In that case, a captain in the Sitka Police Department challenged his firing for having signed two letters: the first expressed concern about an unsafe patrol vehicle and the second complained about "the daily change in department policies and general lack of organization." 649 P.2d at 942. We applied the *Pickering* balancing test and noted:

> Subsequent cases have established that the burden is on the employer to demonstrate not only that the exercise of the employee's rights substantially and materially interfered with the discharge of his duties and responsibilities, but also that the prevention of the disruption outweighed the employee's interest in commenting on, and the public's right to be informed about, matters of public concern.

*Id.* at 944 (citing *Porter v. Califano,* 592 F.2d 770, 779 (5th Cir.1979); *Hostrop v. Board of Junior College District No. 515,* 471 F.2d 488, 492 (7th Cir.1972), *cert. denied,* 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976); *Battle v. Mulholland,* 439 F.2d 321, 325 (5th Cir.1971)). After

examining the working relationships in the Sitka Police Department and concluding that they did "not appear to be of the type to call for Swanner's holding back from fault-finding or for total confidentiality relating to his professional dealings with the police force," we held that the superior court properly denied Sitka's motion for a directed verdict. *Id.* at 945–46.

The superior court found that Haley was terminated in part because of her statements in the television interview. To the extent that this may have formed the basis for her firing, Haley's free speech claims should be analyzed under the *Pickering* balancing test as interpreted by *Swanner.*[3] The parties do not challenge the superior court's conclusion that the *Pickering* factor primarily implicated in Haley's suit is maintenance of personal loyalty and confidence when necessary to a proper functioning of a close working relationship. Appellants assert that the disruption caused to Haley's working relationship with legislators by her statements justified her termination. Their position is that it was critical that the actual and apparent neutrality of legislative researchers be maintained in order to promote the confidence of legislators using research services.[4] Under *Swanner,* the appellants

---

**3.** Charney and Erickson argue that Haley was terminated because she violated AS 24.20.050, which bars members of the professional staff from "joining or supporting any partisan political organization, faction or activity which would tend to undermine the essential nonpartisan nature of their functions and services." They argue that "partisan" should be construed to mean adhering to a cause, as well as to a party. We reject this interpretation, since our view is that "partisan" refers exclusively to political parties. *See Broadrick v. Oklahoma,* 413 U.S. 601, 617 n.16, 93 S.Ct. 2908, 2919 n.16, 37 L.Ed.2d 830, 843 n.16 (1973); *Civil Service Comm'n v. Letter Carriers,* 413 U.S. 548, 557–63, 37 L.Ed.2d 796, 804–08 (1973); *United Public Workers v. Mitchell,* 330 U.S. 75, 100, 67 S.Ct. 556, 569, 91 L.Ed. 754, 773 (1947). We so construe this act out of a belief that the construction urged by Charney and Erickson would render the act impermissibly vague and overbroad. Their construction would arguably prohibit joining or contributing to any organization which expresses a view on any issue of public concern. Such a construction would place the

act squarely at odds with *Pickering* and *Swanner* since much activity would be prohibited which would not threaten to compromise the agency's or the staff member's effectiveness or efficiency. Haley's statements did not pertain to a political party. She could therefore not be fired on this basis. However, it is still clear that Haley could be fired on grounds wholly apart from those set forth in the statute. AS 24.20.050 does not purport to express the entire spectrum of conduct for which a member of the professional staff may be terminated.

**4.** Appellants rely upon the statements of Senator George Hohman as evidencing the disruption caused by Haley's speech. In his affidavit, Senator Hohman states:

(a) The responsibilities of a Policy Analyst [legislative researcher] required more than simple ministerial competence;

(b) The discretion of a Policy Analyst in performing his or her duties or in selecting duties to perform was not severely limited by statute, regulations or policy determinations made by her supervisors;

were required to show that Haley's statements were "substantially and materially" disruptive to this confidence, and that the need for a public neutrality requirement outweighed Haley's interest in public commentary and the public's interest in being informed.

The superior court concluded that the appellants had not established that Haley's statements were sufficiently disruptive, reasoning as follows:

First, it should be noted that plaintiff did not breach any confidential information she held as a result of her job. Secondly, it is unrealistic to expect the researchers, even in a nonpartisan position, not to have personal views on matters of public interest. Presumably, plaintiff held these views or similar ones before she made public comment and was able to perform her job in an outstanding manner. At no time prior to these statements was plaintiff accused of bias or partiality in her work product. Additionally, plaintiff's research demands were primarily in the area of social services, health and welfare. None of the multinational corporations attacked deal directly with those concerns. Thus any bias plaintiff may have had would hardly show up in her work product. Finally, although the statements were made on the Capitol Building steps where the legislature resides, the stated purpose of the demonstration was broader than merely to affect individual legislators. It was to inform the public of their views. On this analysis I conclude that plaintiff's right to the speech and conduct she indulged outweighs any threat to the government interest of her proper and competent job performance.

■ Appellants contend that the question whether Haley materially and substantially disrupted her working relationship with legislators was a question of fact for the jury to decide. Thus, they argue that the superior court erred by making this determination itself. However, viewing appellants' evidence most favorably and extending every reasonable inference in their favor, we conclude that the disruptions proven were not substantial or material. Therefore, the court did not err in deciding in favor of Haley on this issue without the benefit of a jury's factual findings.[5]

(c) The work product of a Policy Analyst, including recommendations and analysis, was often relied upon by legislators in the formulation of legislation and state policy;
(d) A Policy Analyst holds a confidential relationship to policy makers, *i.e.*, legislators;
(e) Loyalty to the Legislature, the Legislative Affairs Agency, and the Legislative Council are essential to the position of a Policy Analyst;
(f) Trust and confidence by legislators of all political persuasions in the Policy Analyst's judgment and public neutrality on issues which are or could be before the Legislature were essential to the position of a Policy Analyst.

In his answers to interrogatories, Senator Hohman states:

It was not the content of her statements which was found offensive. In effect, a public demonstration of a position which she could reasonably assume would be objectionable to some of the legislators for whom she worked dares those legislators to retain confidence in her work product. The value of any policy analyst, such as plaintiff Haley, is greatly diminished if the legislature loses confidence in the product of that analyst.... The Legislative Affairs Agency cannot afford to employ persons whose work product will be automatically disregarded by the legislature for which the person works.

. . . .

The fact that the statement was made not only "in public" but *to* the public is significant in that it flaunts plaintiff's position and belligerance in that it undermined the confidence of legislators representing a variety of political philosophies, which confidence was necessary to the successful performance of her duties; and further it indicates an inability to remain publicly neutral on issues that are or potentially will be before the legislature.

5. *See Williams v. Bd. of Regents of the Univ. Sys. of Georgia,* 629 F.2d 993, 1003 (5th Cir.1980), *cert. denied,* 452 U.S. 926, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981), which states:

Ordinarily, the closeness of a working relationship and the threat and extent of disruption would be a factual question for the jury. The ultimate balancing of the interests of citizen and state with regard to first amendment protection, however, remains in the sphere of the court. Because of this responsibility, as a preliminary matter it was necessary for the court to determine, viewing the appellant's evidence most favorably and extending every

Viewed in the light most favorable to appellants, their evidence established that Haley's statements could result in a loss of legislative confidence in her work. Their evidence does not include a showing that Haley's statements had any *actual* effect on her working relationship with legislators. Absent any evidence of an actual detrimental effect, appellants are left to argue that Haley's statements were necessarily materially and substantially disruptive. *Cf. Pickering*, 391 U.S. at 570–71, 88 S.Ct. at 1735–36, 20 L.Ed.2d at 818. We do not believe that is the case. As the superior court noted, Haley's statements did not concern areas in which she performed research, and her work was uniformly rated as outstanding. Further, her statements did not breach any confidentiality which she was required to maintain. It would be naive to assume that a legislative researcher had no economic views, and we do not believe that a legislator would necessarily disregard Haley's research on issues concerning health and social services upon discovering that she held such views. This is particularly so when no particular bias had ever been noted in Haley's work.

■ Appellants' evidence establishes only that a detrimental effect on legislative confidence was a possible result of Haley's statements concerning multinational corporations. It does not establish that Haley's statements actually, necessarily, or probably had a material and substantial effect on this or any other *Pickering* factor. We conclude that the mere possibility of a loss of legislative confidence is insufficient to meet the material and substantial disruption requirement. Therefore, under *Pickering* and *Swanner*, to the extent that Haley's firing may have been based on her past statements, it was unconstitutional.[6]

Appellants argue that Haley was not terminated because of her past statements, but rather because she refused to refrain from making *future* public comments on issues before or likely to come before the legislature. The superior court concluded that Haley was terminated for both reasons. Had the court submitted this factual issue to the jury, *see Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471, 484 (1977), a jury might reasonably have found that Haley was indeed fired solely because of her refusal to agree as to the future. There is substantial testimony in the record to this effect. We must therefore consider whether such a reason for her termination would be valid. If so, a remand will be necessary to allow a jury to determine whether Haley was fired because of her past speech (an unconstitutional reason) or because of a refusal to limit her future speech.

■ The question is thus whether Haley could constitutionally be terminated for refusing to promise Erickson that she would thereafter refrain from making public statements concerning issues before or likely to come before the legislature. It is clear to us that Haley could not be constitutionally terminated on this basis, since Erickson's ultimatum constituted an impermissible prior restraint on Haley's anticipated speech.

reasonable inference in their favor, whether the disruption or disharmony and breakdown of discipline would overbalance Williams' and/or the public's interest in the communication.

6. The recent case of *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), involved the firing of an assistant district attorney who had circulated a questionnaire concerning internal office matters to her co-workers. Her superior asserted that this questionnaire resulted in a "mini-insurrection." The Court stated that it was not necessary for an employer to "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." 461 U.S. at ——, 103 S.Ct. at 1692, 75 L.Ed.2d at 723. However, that case involved speech which primarily concerned matters of personal interest to the employee. The Court cautioned that "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Id.* Haley's speech focused entirely on public issues as distinct from personal ones. Under these circumstances, more than a showing of a possible detriment to working relationships is required to uphold a termination.

█ A prior restraint is an official restriction imposed upon speech or other forms of expression in advance of actual publication. Emerson, *The Doctrine of Prior Restraint,* 20 Law & Contemp. Probs. 648 (1955). This is in contrast to a subsequent punishment, which is a penalty imposed after the communication has been made. *Id.* Had Erickson informed Haley that she would be terminated if she again violated his interpretation of the public neutrality requirement, his actions would entail a subsequent punishment. However, Erickson informed Haley that unless she at that moment agreed not to speak about certain topics in the future, she would be fired. This constitutes a prior restraint. *See Alderman v. Philadelphia Housing Authority,* 496 F.2d 164, 170 (3d Cir.), *cert. denied,* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974).

█ "Any system of prior restraints of expression comes to [a court] bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584, 593 (1963). One reason why a system of prior restraints holds such disfavor is that it "subjects to government scrutiny and approval *all* expression in the area controlled—the innocent and borderline as well as the offensive...." Emerson, *supra* at 656. Another reason is that, while subsequent punishment does not prevent dissemination of the speech in question, a prior restraint, by its very nature, seeks absolutely to exclude the speech from "the market place of ideas." *Id.* at 657. These considerations and others have resulted in a bar to systems of prior restraints unless there is compelling proof that a prior restraint is essential to a vital governmental interest. *See New York Times Co. v. United States,* 403 U.S. 713, 726–27, 91 S.Ct. 2140, 2147–48, 29 L.Ed.2d 822, 832 (1971) (Brennan, J., concurring) ("[O]nly governmental allegation and proof that publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order.").

We have already examined the governmental interests asserted by appellants and found them not to have been proven as sufficient to justify Haley's termination based on her past speech. It follows that they do not justify the prior restraint which Erickson sought to impose. "[T]he First Amendment tolerates absolutely no [prior restraint] predicated upon surmise or conjecture that untoward consequences may result." *New York Times,* 403 U.S. at 725–26, 91 S.Ct. at 2147, 29 L.Ed.2d at 831 (Brennan, J., concurring). That being the case, Haley's termination insofar as it may have been based on her refusal to limit her future speech was also unconstitutional. A remand to allow a jury to determine why Haley was fired is therefore unnecessary. Under any reasonable view of the evidence, it could not be concluded that Haley was terminated for a reason which was constitutionally permissible.

## II

Having concluded that Haley's termination violated her rights of free expression, we must examine the appellants' defenses to recovery. We consider first the issues raised by the superior court's dismissal of the § 1983 suit against Charney and Erickson. Second, we consider the issues raised by the court's orders as they relate to the State.

### A. *Section 1983 Action Against Charney and Erickson.*

A jury found that Charney and Erickson acted in good faith in terminating Haley, and the superior court, concluding that they could assert qualified immunity as a defense to the § 1983 action, dismissed Haley's suit against them. Haley cross-appeals that order, arguing first that Charney and Erickson are not members of a class which may assert qualified immunity, and second that her termination so clearly violated her constitutional rights that they should not have been permitted to raise the defense.

In *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Court examined its earlier immunity decisions in § 1983 cases and spelled out the conditions developed for recognizing immunity defenses. It stated that official immunity may be recognized in such cases only to the extent consistent with both common law precedent and the purposes of § 1983. 424 U.S. at 421–24, 96 S.Ct. at 990–92, 47 L.Ed.2d at 138–40. Although *Imbler* was a case involving absolute immunity, *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214, *reh'g denied,* 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975), established the same conditions for extending qualified immunity. There the Court concluded that "[c]ommon-law tradition, recognized in our prior decisions, and strong public policy reasons ... lead to a construction of § 1983 extending a qualified good-faith immunity to school board members from liability for damages under that section." 420 U.S. at 318, 95 S.Ct. at 999, 43 L.Ed.2d at 223. Thus, in order to uphold Charney's and Erickson's qualified immunity defenses, we must determine that they would be entitled to such a defense under the common law and that extending the defense to them is consistent with § 1983.

■ Common law precedent generally has granted qualified immunity to government officials only for actions in performance of "discretionary" as opposed to "ministerial" functions. Restatement (Second) of Torts § 895D comments d and f (1979); W. Prosser, Handbook of the Law of Torts § 132, at 988–89 (4th ed. 1971). "Discretionary" acts are those requiring "personal deliberation, decision and judgment," while "ministerial" acts amount "only to an obe-

dience of orders, or the performance of a duty in which the officer is left with no choice of his own." Prosser, *supra.* We believe that under such a distinction Charney's and Erickson's acts in terminating Haley should be considered discretionary. The record indicates that a substantial amount of discretion was afforded these officers in their enforcement of the so-called public neutrality requirement. Thus, the first requirement of *Imbler* and *Wood* is satisfied.

■ To determine if sufficient policy justifications for immunity exist, the Supreme Court has balanced the public interest in the effective performance of official duties against the plaintiff's interest in civil redress for constitutional wrongs. *Imbler,* 424 U.S. at 427–28, 96 S.Ct. at 993–94, 47 L.Ed.2d at 141–42; *Wood,* 420 U.S. at 318–22, 95 S.Ct. at 999–1000, 43 L.Ed.2d at 223–25. Qualified immunity has been justified "to avoid discouraging effective official action by public officers charged with a considerable range of responsibility and discretion." *Wood,* 420 U.S. at 317–18, 95 S.Ct. at 998–99, 43 L.Ed.2d at 222. Charney was the executive director of the Legislative Affairs Agency. Erickson was the director of the Research Division of that agency. These are positions of considerable responsibility and discretion, and we believe that the public interest in the effective performance of their duties is substantial. We therefore conclude that the second requirement of *Wood* and *Imbler* is likewise satisfied, and hold that these positions are of a type which give rise to qualified immunity.[7] In reaching this conclusion, we are guided by cases extending

---

7. In *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (holding prison officials were entitled to qualified immunity), the Court apparently departed from the *Wood* and *Imbler* approach to immunity under § 1983. In his dissenting opinion in that case, Justice Stevens states:

Today's decision ... strongly implies that every defendant in a 1983 action is entitled to assert a qualified immunity from damage liability. As the immunity doctrine developed, the Court was careful to limit its holdings to specific officials, and to insist that a con-

sidered inquiry into the common law was an essential precondition to the recognition of the proper immunity for any official. These limits have now been abandoned.

434 U.S. at 568, 98 S.Ct. at 863, 55 L.Ed.2d at 35 (citations and footnotes omitted). However, at least one commentator suggests that *Navarette* should not be interpreted as overturning *Imbler* and *Wood.* Sowle, *Qualified Immunity in Section 1983 Cases: The Unresolved Issues of the Conditions for Its Use and the Burden of Persuasion,* 55 Tul.L.Rev. 326, 362–63 (1981).

qualified immunity to the following officials in § 1983 actions: school board members and school superintendent, *Wood*, 420 U.S. at 318–22, 95 S.Ct. at 999–1000, 43 L.Ed.2d at 222–25; *McGhee v. Draper*, 564 F.2d 902, 913 (10th Cir.1977); public defender, *Dodson v. Polk County*, 628 F.2d 1104, 1107–08 (8th Cir.1980), *rev'd on other grounds*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); sheriff, *Bryan v. Jones*, 530 F.2d 1210, 1215 (5th Cir.) (en banc), *cert. denied*, 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145 (1976); state governor, National Guard officers, and a state university president, *Scheuer v. Rhodes*, 416 U.S. 232, 242–49, 94 S.Ct. 1683, 1689–92, 40 L.Ed.2d 90, 100–04 (1974); superintendent of state hospital, *O'Connor v. Donaldson*, 422 U.S. 563, 577, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396, 408 (1975).

Haley's second argument in this regard is that her constitutional rights were so clearly violated by her termination that it was error to allow Charney and Erickson to assert qualified immunity. The Supreme Court delineated this issue in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982):

> On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the de-

fense would turn primarily on objective factors.

457 U.S. at 818–19, 102 S.Ct. at 2738–39, 73 L.Ed.2d at 410–11 (footnotes omitted).

We do not believe that the law governing the constitutional issues in this case was so clearly established that Charney and Erickson should be denied official immunity. While *Pickering* and its progeny made it clear that Haley did not surrender her free speech rights upon accepting public employment, the exact dimensions of those rights were left to be determined by the consideration of many factors. To a large degree, the outcome of this case could only be determined after evidence was gathered concerning the extent of the disruption to Haley's working relationship with individual legislators. Indeed, cases involving circumstances similar to Haley's have concluded that no constitutional violation occurred. *See, e.g., Abbott v. Thetford*, 534 F.2d 1101 (en banc), *rev'g and adopting dissenting opinion*, 529 F.2d 695 (5th Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977). To the extent that Haley's termination may have resulted from her refusal to limit her future speech, we likewise do not believe that a reasonably competent official would or should have been aware that this constituted a prior restraint as that term is constitutionally defined. We therefore affirm the superior court's dismissal of the § 1983 suit against Charney and Erickson.

### B. *Relief Against the State*

The superior court concluded that Haley was entitled to back pay, back benefits and reinstatement as a legislative researcher and ordered such relief against the State. The State argues that this was error for several reasons.

First, the State argues that because we held in *State v. Green*, 633 P.2d 1381 (Alaska 1981), that the State may not be sued in a § 1983 action, there is no basis for Haley's cause of action against it. The superior court rejected this argument, ruling instead that a cause of action could be implied directly from the constitutional provi-

sions which it determined had been violated. In so ruling, the court apparently relied on United States Supreme Court cases implying constitutional causes of action, *see Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971),[8] and on an article by one commentator urging the implication of such causes of action against states in state courts. L. Wolcher, *Sovereign Immunity and the Supremacy Clause: Damages Against States in Their Own Courts for Constitutional Violations*, 69 Cal.L.Rev. 189 (1981). However, we need not consider the validity of this position since, in our view, Haley has been afforded a statutory cause of action under AS 09.50.250.

■■■ Section 250 provides that "[a] person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in superior court." Haley's claim is that she was wrongfully discharged from employment. Thus, her claim arises out of her employment relationship with the State. We think that implicit in her contract of employment was the State's promise not to terminate Haley for an unconstitutional reason. This is analogous to the covenant of good faith and fair dealing we

recently implied in a private sector at-will employment contract in *Mitford v. de Lasala*, 666 P.2d 1000, 1007 (Alaska 1983). In effect, we hold that when the State fires an employee for an unconstitutional reason, this amounts to unfair dealing as a matter of law and gives rise to contract remedies. We therefore consider the reference in section 250 to contract claims to be broad enough to encompass Haley's action.

■■■ This reasoning likewise disposes of the State's second argument, which is that sovereign immunity bars Haley's recovery of back pay and benefits. By enacting section 250, the legislature has exercised its authority, pursuant to Alaska Const. art. II, § 21, to waive the State's immunity to suits asserting contract claims against it. *See State v. ZIA, Inc.*, 556 P.2d 1257, 1260 (Alaska 1976).[9]

■■■ The State next argues that legislative immunity bars Haley's action.[10] This argument is based on common law principles and on Alaska Const. art. II, § 6, which provides in part that "[l]egislators may not be held to answer before any other tribunal for any statement made in the exercise of their legislative duties while the legislature is in session." Haley responds that the act of firing her was not within the sphere of legislative immunity, and even if it was, that the Legislative Affairs Agency, unlike the Legislative Council, is not entitled to raise that defense.[11]

---

8. *Cf. Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (declining to authorize a new nonstatutory damages remedy for federal employees whose first amendment rights are violated, since such claims arise out of an employment relationship that is governed by comprehensive provisions giving meaningful remedies against the United States).

9. Since Haley's claim was not for services "given to or for the state," she was not required to present her claim under AS 44.77.010–.060 for administrative review. *See State v. ZIA, Inc.*, 556 P.2d 1257, 1262 (Alaska 1976).

10. The State also asserts that the Legislative Council and the Legislative Affairs Agency are protected by qualified immunity. However, "[q]ualified or 'good faith' immunity is an affirmative defense that must be pleaded...." *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct.

2727, 2737, 73 L.Ed.2d 396, 408 (1982) (citing *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)). These appellants failed to plead qualified immunity and we therefore do not consider its merits with respect to them.

11. Haley also contends that the failure to assert legislative immunity in the proceedings below raises a question as to whether that issue is properly before this court. However, the failure to raise this defense at trial does not necessarily constitute a waiver of the immunity. In *Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), appellants first raised legislative immunity on appeal. The Court allowed the defense even though the appellee's motion to dismiss the appeal asserted that the failure to raise the question at trial resulted in a waiver of the immunity. 446 U.S. at 730 n. 9. 100 S.Ct. at 1974 n. 9, 64 L.Ed.2d at 652 n. 9; *see also United States v.*

We recently addressed Alaska's legislative immunity provision in *Kerttula v. Abood*, 686 P.2d 1197 (Alaska 1984). We stated that the clause's protection for "legislative duties" clearly extended to certain core legislative activities such as voting, introducing legislation, and questioning witnesses in legislative hearings. *Id.* at 1202. We noted that the limits of immunity were less clear beyond these core activities, *id.* at 1202, but held that preparation for a legitimate legislative duty was protected, at least when the preparatory activity was not illegal. *Id.* at 1204.

 In the present case, we hold that Haley's termination was an administrative rather than a legislative act, and that it was therefore not within the scope of legislative immunity. Appellants attempt to characterize the dismissal as the result of a broad policy formulation emanating from the Legislative Council. However, the record fails to substantiate that view. To the contrary, it appears that Haley's termination resulted from a misguided application of AS 24.20.050 to a specific situation. The application of legislation to specific situations is generally not within the scope of legislative immunity. *See Visser v. Magnarelli*, 542 F.Supp. 1331, 1333 & n.4 (N.D.N.Y.1982); *Three Rivers Cablevision, Inc. v. City of Pittsburgh*, 502 F.Supp. 1118, 1136 (W.D.Pa.1980); *see also Developments in the Law—Zoning*, 91 Harv. L.Rev. 1427, 1510–11 (1978).

Further, we do not believe that Haley's dismissal, even if it was the result of an independent policy decision, was intimately related to the legislative process. This conclusion is supported by *Davis v. Passman*, 544 F.2d 865 (5th Cir.1977), *rev'd*, 571 F.2d 793 (5th Cir.) (en banc), *rev'd* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), in which it was held that legislative immunity

did not shield a Congressman's unconstitutional dismissal of his deputy administrative assistant. The court stated that "[w]hen members of Congress dismiss employees they are neither legislating nor formulating legislation. The fear of judicial inquiry into dismissal decisions cannot possibly affect a legislator's decisions on matters pending before Congress." 544 F.2d at 879–880. The court rejected Passman's argument, similar to the State's in the present case, that because high-ranking staff members may sometimes influence how a legislator performs his deliberative duties, such dismissals should be exempt from judicial review: "The prospect that a dismissal decision will in turn affect the legislative process is ... extremely remote." *Id.* at 880 n.25.[12]

Since we have determined that Haley's dismissal was not within the sphere of legislative immunity, we need not address her argument that the Legislative Affairs Agency is not entitled to raise that defense.

 Finally, the State argues that the doctrine of separation of powers prohibited the superior court from ordering Haley's reinstatement. However, judicial review of legislative employment decisions is constitutionally limited only by the reach of legislative immunity as expressed in art. II, § 6 of the Alaska Constitution. This provision speaks directly to the separation of powers concerns raised by the State. *See Davis v. Passman*, 442 U.S. 228, 235 n.11, 99 S.Ct. 2264, 2272 n.11, 60 L.Ed.2d 846, 856 n.11 (1979). Our holding that Haley's dismissal was not a legislative act therefore answers this contention.

### III

We have concluded that Haley's termination was unconstitutional and that she has

---

*Helstoski*, 442 U.S. 477, 491, 99 S.Ct. 2432, 2440, 61 L.Ed.2d 12, 24 (1979) (speech or debate clause immunity waived, if at all, "only after explicit and unequivocal renunciation of the protection").

12. Davis' complaint was based on the equal protection component of the fifth amendment due process clause. 544 F.2d at 868. The Fifth

Circuit, sitting *en banc,* reversed the panel's decision, holding that "no right of action may be implied from the Due Process Clause of the fifth amendment." 571 F.2d at 801. The Supreme Court reversed this holding. However, neither the Supreme Court nor the Fifth Circuit sitting *en banc* 99 S.Ct. at 2272 n. 11, addressed the legislative immunity issue. 442 U.S. at 235 n. 11, 60 L.Ed.2d at 856 n. 11.

stated a cause of action against the State not barred by an immunity defense. We must now consider the remedial issues raised by the parties.

■■■ First, appellants contend that Haley's right to back pay, back benefits and reinstatement terminated upon the abolition of the Legislative Affairs Agency Research Division on June 18, 1979.[13] The superior court determined that Haley was entitled to back pay and benefits until the date of her reinstatement, and that the abolition of the Research Division did not bar Haley's reinstatement:

> The abolition of the research division … does not allow the defendants to avoid the necessity for proving that employment in a nonpartisan legislative agency is now impossible. Defendants have not shown that it would be impossible. In fact, defendants have indicated the availability of monies under their control to fund a position ostensibly to be created elsewhere.

Accordingly, the court ordered reinstatement and awarded back pay and benefits to December 15, 1981.

Appellants contend that in ordering reinstatement and awarding back pay and benefits for a period after the Research Division was abolished, the superior court left Haley better off than the remainder of the Research Division staff, who were dismissed in any event. The strength of this argument is greatly diminished by the fact that after the Research Division was abolished, the House of Representatives created the House Research Agency with the intent of hiring as many former staff members of the Research Division as possible. As Haley notes, one former researcher was kept on with the Legislative Affairs Agency, another moved to a job created in the governor's office, and a third was hired as an administrative assistant to Charney.

Two others were employed by the House Research Agency, which had around seven staff positions available. It thus appears that if Haley had not been unconstitutionally discharged, she would have had available to her an equivalent position in another legislative agency. For this reason, we hold that the superior court's award of back pay and benefits and order of reinstatement as of December 15, 1981 was not in error.

■■■ Second, Haley argues that the superior court erred in not submitting the issue of punitive damages to the jury. The question of punitive damages must be sent to the jury if it is found that "fair-minded jurors in the exercise of reasonable judgment could differ as to whether … [the defendant's] actions amounted to reckless indifference to the rights of others, and conscious action in deliberate disregard of them, thereby evidencing a state of mind which could justify the imposition of punitive damages…." *Sturm, Ruger & Co. v. Day*, 594 P.2d 38, 47 (Alaska 1979), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981). Contrary to Haley's assertions on appeal, we do not believe that the scope of her constitutional rights was so clearly defined that her dismissal evidenced a "reckless indifference" to her rights. *See* section II A, *supra*. We therefore perceive no reversible error in this regard.[14]

■■■ Third, Haley contends that the superior court erred in failing to submit the following instruction to the jury:

> You may also award general damages for infringement of constitutional rights. The purposes of such an award are to redress the inherent loss suffered by a person whose constitutional rights have been violated and to uphold the right itself. Although the loss is nonpersonal

---

13. The State briefly argues that reinstatement is inappropriate because Haley has already been placed in a "professional position" in the Commerical Fisheries Entry Commission. However, if Haley is otherwise entitled to reinstatement, she should be reinstated as a legislative re-searcher. As a result, her present position does not render reinstatement inappropriate.

14. We note also that AS 09.50.280 provides that punitive damages may not be awarded against the State or its agencies. *See Univ. of Alaska v. Hendrickson*, 552 P.2d 148 (Alaska 1976).

and intangible, it is real and the law recognizes it as compensable.

You are the sole judges of the appropriate amount of such damages.

The proposition that damages may be awarded for the deprivation of a constitutional right in and of itself under 42 U.S.C. § 1983 was laid to rest in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). There the Court stated that substantial damages should not be awarded for the deprivation of a constitutional right if no particular injury was caused thereby:

Insofar as petitioners contend that the basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights, they have the better of the argument. Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interest they protect.

435 U.S. at 254, 98 S.Ct. at 1047, 55 L.Ed.2d at 259. The constitutional right involved in *Carey* was the right to procedural due process, but the "actual injury" requirement has been applied to free speech violations as well. *See Buise v. Hudkins,* 584 F.2d 223, 229 (7th Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979); *Davis v. Village Park II Realty Co.,* 578 F.2d 461, 463 (2d Cir.1978); *Atcherson v. Siebenmann,* 458 F.Supp. 526, 537 (S.D. Iowa 1978), *modified,* 605 F.2d 1058 (8th Cir.1979); *O'Brien v. Leidinger,* 452 F.Supp. 720, 727 (E.D.Va.1978).

Haley's action against the State is of course not based on § 1983. Nevertheless, we think that the damages principles developed under that provision may appropriately be applied here as well. We therefore hold that the superior court did not err in failing to submit to the jury Haley's proposed instruction on general damages for infringement of constitutional rights. Haley has been awarded back pay and back benefits for the period from her unlawful discharge to her reinstatement. Under the circumstances of this case, these damages were adequate to compensate her injuries.[15]

 Fourth, Haley contends that inconsistency in the jury's verdict on mental and emotional distress warrants resubmission of this issue on remand. In its special verdict, the jury found that Haley suffered mental and emotional distress as a result of her termination, but awarded her nothing for the injury. Because Haley in no way raised this issue before the superior court, the rule of *City of Fairbanks v. Smith,* 525 P.2d 1095 (Alaska 1974), precludes resubmission. There it was held that if counsel does not ask to poll the jury, or object to excusing the jury or to the filing of the verdict, the right to challenge the consistency of the verdict is waived. *Id.* at 1097.

 Finally, Haley argues that she was entitled to full reasonable attorney's fees either as a public interest litigant or as a "prevailing party" under 42 U.S.C. § 1988.[16] The former argument is without merit. The superior court was entitled to conclude that the major emphasis of Haley's case was the recovery of a remedy personal to her. *See Anchorage v.*

---

15. *Carey* has been criticized on the ground that the "actual injury" requirement fails in some instances to recognize the intrinsic value of substantive constitutional rights. Note, *Damage Awards for Constitutional Torts: A Reconsideration after Carey v. Piphus,* 93 Harv.L.Rev. 966 (1980). However, Haley's free speech rights were fully exercised, since she spoke out against multinational corporations despite the warnings of her superior. Thus, even if we were to conclude that damages should be awarded to compensate for the loss of constitutional rights in and of themselves, such an award would be inappropriate on the facts of this case. *Com-*

pare *Dellums v. Powell,* 566 F.2d 167, 195–96 (D.C. Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161, *reh'g denied,* 439 U.S. 886, 99 S.Ct. 234, 58 L.Ed.2d 201 (1978).

16. 42 U.S.C. § 1988 (Supp.V 1981) provides in pertinent part:

In any action or proceeding to enforce a provision of section[s] ... 1983 ... of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

*McCabe,* 568 P.2d 986, 991 (Alaska 1977). Further, Haley had sufficient economic incentive to bring an action even if it involved only narrow issues lacking general importance. *See Kenai Lumber Co. v. Le-Resche,* 646 P.2d 215, 223 (Alaska 1982).

■■■■ On the other hand, we believe that Haley is entitled to § 1988 attorney's fees. Judge Stewart determined that Haley was a prevailing party in her action and ordered that Haley be awarded attorney's fees "in accordance with applicable rules." Judge Stewart subsequently retired from the bench and was replaced on this case by Judge Schulz, who denied Haley full reasonable attorney's fees pursuant to § 1988, and awarded only partial fees under Alaska R.Civ.P. 82. The apparent reason for this denial was the court's view that Haley was not a prevailing party with respect to her § 1983 action against Charney and Erickson. This was in error. The qualified immunity defense served only to bar their liability for money damages; injunctive reinstatement could have been obtained by Haley against them despite their good faith. *See Saffron v. Wilson,* 481 F.Supp. 228, 250 (D.D.C.1979) (official immunity may be asserted in suit for damages, but not in suit for injunctive, declaratory or mandamus relief); *see also National Treasury Employees Union v. Nixon,* 492 F.2d 587, 609 (D.C.Cir.1974); *Safeguard Mutual Insurance Co. v. Miller,* 472 F.2d 732, 734–35 (3d Cir.1973). Because Haley would thus have been entitled to an order of reinstatement against Charney and Erickson, she should have been considered a prevailing party in her § 1983 action. *See Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40, 50 (1983) (" '[P]laintiffs may be considered "prevail-

ing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit,' " *quoting Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978) ); *Busche v. Burkee,* 649 F.2d 509, 521 (7th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981)(plaintiff need not prevail on every issue to be awarded attorney's fees under § 1988); *see also Teitelbaum v. Sorenson,* 648 F.2d 1248, 1250 (9th Cir. 1981) (defendant's good faith alone will not warrant denial of attorney's fees under § 1988). Therefore, a remand is necessary to allow the superior court to apply the standards for § 1988 attorney's fees awards rather than the standards under Alaska R.Civ.P. 82. *See Ferdinand v. City of Fairbanks,* 599 P.2d 122, 125 & n.9 (Alaska 1979).[17]

For the foregoing reasons, the judgment of the superior court is AFFIRMED, except as to the award of attorney's fees, for a redetermination of which this case is REMANDED for further proceedings in accordance with this opinion.

COMPTON and MOORE, JJ., not participating.

BURKE, Chief Justice, concurring.

On the issue of the legality of Haley's termination, I would affirm the superior court's judgment on independent state grounds.

Article I, section 5 of the Alaska Constitution provides: "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." This language is far more explicit than that contained in the free speech

---

**17.** We note that in *Hutto v. Finney,* 437 U.S. 678, 700, 98 S.Ct. 2565, 2578, 57 L.Ed.2d 522, 540 (1978), the Supreme Court endorsed the rule that fees may not be awarded against public officials in their individual capacities unless bad faith is demonstrated. However, this rule has no applicability here since Charney and Erickson were sued in their official capacities. *Id.* at 693, 700, 98 S.Ct. 2578, 57 L.Ed.2d at 536, 540. The State asserts that any award of attorney's fees against it is barred by sovereign immunity

and legislative immunity. This is certainly incorrect with respect to § 1988 attorney's fees. Sovereign immunity will not preclude attorney's fees awards under that provision, *see Ferdinand v. City of Fairbanks,* 599 P.2d 122, 123 n. 1 (Alaska 1979), and legislative immunity will bar such awards only insofar as the underlying cause of action is barred. *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 738–39, 100 S.Ct. 1967, 1977–78, 64 L.Ed.2d 641, 657–58 (1980).

clause of the federal Constitution: "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. As stated in *Press, Inc. v. Verran,* 569 S.W.2d 435, 442 (Tenn.1978), a case interpreting a provision similar to Alaska's article I, section 5, the language of the state constitution "is clear and certain, leaving nothing to conjecture, and requiring no interpretation, construction or clarification."[1] The right of *every person,* including Haley, to speak on *all subjects* is guaranteed. There are no exceptions, although sanctions may be imposed for an *abuse* of that right. *See, e.g., Webb v. State,* 580 P.2d 295, 302 (Alaska 1978) (lies told to the police by an accomplice after the fact to the crime of murder not protected).

It is difficult to understand how one can abuse the right to speak by the mere exercise of that right. Even more difficult to understand is how the right can be abused by one's refusal to promise not to exercise it at some future time. The cause for Haley's discharge, however, appears to have been nothing more that a combination of these reasons.[2] Apart from the fact that she spoke, and refused to promise not to speak again, on a subject considered controversial by her employer, Haley said and did nothing that could be characterized fairly as an abuse of the right guaranteed her by article I, section 5 of the Alaska Constitution.

Otherwise, I concur.

---

1. What amounts to an "abuse" of the right to speak under article I, section 5 does require interpretation of that term. The identity of those possessing the right ("every person") and the nature of the right itself (to "speak on all subjects"), however, are matters upon which there can be no disagreement.

2. For purposes of this decision, I have assumed that Haley was terminated for both reasons.