Walter A. JOHNSON, Sammy Johnson, Harold Gray, Russell Bogren, Myron Johnson, Eli Hanlon, Jr., Vernon Hanson, Jerry Milton, Clarence Milton, Jr., Daryl James, Alex James, Sheldon James, Cameron James, Billy Williams, and Bill Milton, Appellants/Cross–Appellees,

v.

ALASKA STATE DEPARTMENT OF FISH & GAME, Alaska Board of Fisheries, State of Alaska, Appellees/Cross–Appellants.

Nos. S–3000, S–3001.

Supreme Court of Alaska.

Nov. 29, 1991.

898

Arthur S. Robinson, Robinson, Beiswenger & Ehrhardt, Soldotna, for appellants/cross-appellees.

Tricia Collins, Juneau, for appellees/cross-appellants.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

The appellants, all Alaska Native fishermen, began their action in superior court alleging that emergency orders issued by the Alaska Department of Fish and Game (Department) and regulations promulgated by the Alaska Board of Fisheries (Board)

discriminated against them because of their race. After a bench trial, the superior court entered judgment against the state, finding that the Department and Board had violated AS 18.80, the Alaska Human Rights Act. The superior court, however, awarded the plaintiffs only declaratory relief.

The plaintiffs have appealed three aspects of the superior court's decision: (1) the court's finding that they did not prove compensatory damages with reasonable certainty; (2) the court's ruling that punitive damages are not available against the state for violations of AS 18.80, the Alaska Human Rights Act; and (3) the superior court's refusal to accord issue preclusive effect to the findings and conclusions in an order of the Alaska Human Rights Commission. We reverse the superior court's decision on compensatory damages and remand for a redetermination of damages on the present record. We affirm the court's ruling on punitive damages. We reverse the court's decision on issue preclusion and modify the judgment accordingly.

Finally, the superior court decided that sovereign immunity does not bar actions for compensatory damages against the state under AS 18.80. The state appeals that decision. We affirm.

I

A

Alaska Native fishermen from the Tlingit community of Yakutat, in southeast Alaska, fish for salmon in the rivers of their region and in the ocean surf.[1]

At the mouths of the Alsek and East Alsek rivers, fifty miles south of Yakutat, surf fishing is especially hazardous. As a result, the inriver sites on the Alsek and East Alsek are distinctly preferable. The Yakutat fishermen, however, rarely venture far upstream on either of these rivers. On the Alsek and East Alsek, the better inriver sites are the territory of white fishermen. Several factors contribute to the racial division at the Alsek and East Alsek, but the most important of these is the territorial hostility shown by some white fishermen. Evidence indicates that the white fishermen began driving the Native fishermen downstream early in this century. By 1931, the Native fishermen rarely fished further upstream than the rivers' mouths. There is no doubt that over the years the inriver fishermen have resorted to violence, including use of firearms, to maintain control of the inriver sites.

Two agencies share the main responsibility for managing the Alsek and East Alsek salmon fisheries: the Department of Fish and Game and the Board of Fisheries.[2] The primary concern of both agencies is insuring that sufficient numbers of migrating salmon escape the gear of fishermen and continue on to spawn each year. Measuring escapement on the Alsek River presents especially difficult problems. To begin with, the Alsek is well over one hundred miles long, but only the last twenty miles flows within Alaska. The remainder of the river and its headwaters are in Canada. Additionally, the Alsek water in Alaska is heavy with silt, and early estimates of escaping salmon are often inaccurate. By contrast, escapement in the East Alsek River is much easier to measure, because the river is only three and one-half miles long, clear and entirely within Alaska. Not surprisingly, the state employs different management techniques at each of the rivers: Regulators may respond quickly to local indications of poor escapement on the East Alsek, but they generally must wait until definitive data on total escapement

1. White fishermen who work in the region do not fish in the surf. The sole white fisherman identified as ever having fished in the surf in the Yakutat region was Dolph Hensley, whose wife was a Yakutat native. Tlingit fishermen testified that Hensley had been accepted as a member of the Native community.

2. Nominally, the Department of Public Safety, Division of Fish and Wildlife Protection, is in charge of law enforcement, including enforcement of fishing regulations, in the Alsek and East Alsek area. Unavailability of personnel, however, has constrained the department to forgo some enforcement responsibilities and to delegate others to the Department of Fish & Game officials who work on-site at the fisheries during salmon season.

arrives from Canada at the end of the fishing seasons before they can adjust limits on the Alsek.

The Board is a policy-making agency;[3] it promulgates regulations that, among other things, designate areas and times for fishing, size and type of gear, and minimum distances between units of gear.[4] The Department is more of a policy-implementing agency, providing specific, on-site management of salmon stocks during the fishing season.[5] For example, the Department conducts ongoing studies of salmon escapement during fishing season, and, to protect the salmon stocks, may issue emergency orders that restrict the area and the time within which fishing may occur at any given fishery. Several Department officials share the power to issue such orders in any particular fishing area. The hierarchy of Department officials with this power in the Yakutat area includes a Regional Supervisor, a Finfish Management Coordinator for Southeastern Alaska, and an Area Management Biologist for the Juneau Management Area. These officials are based in Juneau. The area management biologist occasionally visits the Yakutat area during fishing season. Otherwise, for on-site information and recommendations regarding regulation of the Yakutat fisheries, the Department officials in Juneau are mainly dependent upon a fourth official: the person who has been fishery technician in the Yakutat area since 1961, Alex Brogle.

Throughout his tenure in Yakutat, Alex Brogle openly despised the Yakutat surf fishermen. The superior court concluded after trying this case:

Brogle displayed a reservation mentality that led him to the view that the Yakutat natives should stay in fisheries close to town and not venture to the Alsek and East rivers where they would interfere with the commercial harvesting activities of people for whom Brogle had higher regard. Unquestionably Brogle was not disposed to manage the Alsek and East river fisheries in such a way as to preserve, to the extent possible, equality of opportunity to catch fish.

The "people for whom Brogle had higher regard," of course, were the white, inriver fishermen.

Brogle's supervisors at the Department clearly knew of Brogle's racist and discriminatory bent; Brogle's weekly and seasonal reports to Juneau typically contained racist slurs, especially slurs attacking the Yakutat natives. Nonetheless, by all accounts, Brogle exercised significant influence over the Department's management of the Alsek and East Alsek rivers. Brogle's influence was especially apparent in the Department's response to the crisis in the Alsek fishery that followed the 1978 and 1979 salmon runs.

In 1978 and 1979, the number of persons fishing in the surf and at inriver sites on the Alsek and East Alsek increased dramatically.[6] For example, eighteen people fished the Alsek in 1977, twenty-nine in 1978, and thirty-eight in 1979. Not surprisingly, 1979 saw a record catch of red salmon in the area. Five years earlier, in the 1974 season, the number of fishermen in the area had reached a previous all-time

**3.** *See generally Kenai Peninsula Fisherman's Coop. Ass'n v. State,* 628 P.2d 897, 902–03 (Alaska 1981).

**4.** AS 16.05.251.

**5.** *See* AS 16.05.050; AS 16.05.060; *see also* AS 44.17.–005; 44.17.030.

**6.** A decline in harvests at other fisheries in the region was one reason Yakutat fishermen turned to the Alsek and East Alsek area in the 1970s. Another reason for the increase in surf fishermen was an improvement in equipment. There is no road from Yakutat to the fishery, so the Tlingit surf fishermen must make the fifty-mile open ocean trip south in their skiffs. Most surf fishermen only somewhat recently obtained the sort of boats and powerful motors that make the journey with ease. The improved equipment also enhanced the surf fishermen's effectiveness in the difficult Alsek and East Alsek surf.

As in prior years, the inriver fishermen employed threats of violence, including gunshots, to insure that none of the new surf fishermen moved upstream. The inriver fishermen also apparently hoped that their belligerence would reverse the general increase of competition in the area by chasing some of the new surf fishermen away from the area entirely.

high.[7] This suggested that there might be a repercussive effect in 1979, among salmon returning to their spawning waters five years after hatching there. Nonetheless, initial Department measurements showed that an acceptably large number of fish were escaping in 1979. Later, however, data from Canada proved that the Department had been wrong in respect to the Alsek River; final figures showed that the 1979 escapement on the Alsek was "disastrously low." By the time the Department learned of its error, of course, the regulatory agencies could only respond by regulating the 1980 season on the Alsek.

Alex Brogle recommended to his supervisors that the best response to the emergency would be to close the surf fishery at the Alsek, to limit fishing inriver to two days per week, and to make adjustments as necessary during the season. He justified his solution by arguing that the recent increase in surf fishing was a primary cause of the problem. Brogle's recommendations became public on May 7, 1980, when two members of the Board of Fisheries held an open meeting in Yakutat.[8] Four Department officials attended the meeting, including Paul Larson, the Finfish Management Coordinator for Southeast Alaska, and Brogle. Some fifteen to twenty local fishermen and some members of the Yakutat Advisory Board also attended the meeting.

Brogle explained his proposal to the assembly. The Yakutat residents countered with a proposal that included reduced gear size and limited open surf fishing to within one-half mile of the river mouths. The Department officials admitted that either their solution or a solution similar to the local residents' counter-proposal probably would work. Evidence shows, however, that Department officials disfavored the gear reduction proposal in part because it would protect the native surf fishermen at the expense of the inriver white fishermen. As the Area Management Biologist Don Ingledue wrote, one week later, in a memorandum to another Department official:

The [Department] staff's position is that either management approach would be acceptable from a resource conservation standpoint. A regulatory emergency does not exist that would je[o]p[a]rdize the resource since we do have emergency order powers limiting time and area. However, any adjustments in gear size would have to be instituted under the Emergency Regulatory Authority of the Commissioner and the Board of Fisheries.

The gear reduction approach would benefit the local residents more than the management plan originally proposed by the staff. Again it should be pointed out that only local Yakutat fishermen were present at the meeting and many Alsek River fisherman had no knowledge of the meeting since they reside out of state and community.

Ingledue sent copies of this memorandum to Larson and Brogle.

Exactly two weeks after Ingledue sent his memo, on May 27, 1980, Larson issued Emergency Order No. 1–Y–1–80, which banned surf fishing in the area that encompassed the Alsek and East Alsek river mouths and which limited inriver fishing to two days per week. The order took effect on June 2, 1980, and ran through June 22, 1980, when Ingledue issued Emergency Order No. 1–Y–2–80, which lifted the ban on surf fishing. The new order explained: "The early portion of sockeye [red salmon] run is now past and effort in the Alsek–

7. A surge in activity in 1973 and 1974 was probably due to anticipation of the limited entry program. The Department responded to the 1974 increase by limiting open fishing time from four to two days per week. Coincidentally, the device Canadian regulators used to measure escapement on the Alsek—a fish "weir"—was not in operation until 1976. Thus, the Department did not have detailed escapement data available for a predictive analysis of the 1979 salmon run on the Alsek. Instead, the Department's historical data mainly consisted of

records showing the number of fishermen on the Alsek in 1974 and the size of the catch that year.

8. The Board did not widely advertise the meeting, nor did the Board intend the meeting to be a public hearing on the immediate problem of regulating the Alsek fishery. Nonetheless, the question of regulating fishing on the Alsek for the 1980 season dominated the public meeting.

East River area has declined.... Shifting of the river mouth sand bar has reduced the past efficiency of the net gear in [the surf] area and the closure is no longer necessary."

In late 1980, the Board of Fisheries adopted the surf closure at the Alsek and East Alsek rivers as part of a permanent regulation affecting "all rivers south of the Dangerous River." The new regulation also limited gear length and reduced the maximum number of allowable nets per fisherman for part of the season. Importantly, the regulation also directed the Department to open, by emergency order, the surf fishery at the East Alsek River during the peak week of the red salmon run. The partial opening of the surf was necessary, in the Board's opinion, to avoid violence between the inriver fishermen and the Yakutat native fishermen. According to Larson, the Board's sense of the likelihood of violence was in part due to testimony that the board had heard from surf fishermen who said that, with the surf fishery closed, "they were afraid to go fish in [the Alsek and East Alsek] rivers."

Unfortunately, the emergency opening of the East Alsek surf fishery from July 20 to August 9, 1981, was interrupted by a fierce storm, which forced surf fishermen to abandon some nineteen nets. Alex Brogle subsequently claimed that the abandoned nets killed and wasted a "tremendous" number of fish. Ultimately, two separate tribunals—the Human Rights Commission and the superior court—both concluded that the storm-tangled, abandoned surf nets had *not*, in fact, caused much waste of fish. At the time, however, Brogle's claims of waste in 1981 were instrumental in convincing the Department to keep the East Alsek surf fishery closed during the peak period in 1982.

On May 27, 1983, the Alaska Human Rights Commission enjoined the Department and the Board of Fisheries "from issuing and/or enforcing any regulation, order, or other official measure closing the surf at the Alsek or East Rivers at times when fishing within these rivers is allowed." On June 19, 1983, the state opened the Alsek and East Alsek surf fisheries. The record indicates that no surf fishermen worked in the Alsek surf in 1983, but that a few did fish in the East Alsek surf that year.

**B**

Walter Johnson, one of the surf fishermen, filed a complaint with the Commission on July 7, 1980, alleging that the Department's first emergency order closing the surf fishery discriminated against him and other native surf fishermen on the basis of their race. The state filed an answer in November 1981; substantial discovery followed; and the Commission conducted a hearing in Yakutat on April 19, 1982. The Commission hearing officer, (now Judge) Joan M. Katz, issued a decision on January 21, 1983, in which she concluded that the state "has discriminated against plaintiff in violation of AS 18.80.255(1) [of the Alaska Human Rights Act] and ... injunctive relief should issue." The hearing officer specifically found that Alex Brogle's "recommendations formed the basis for official actions," and his racial prejudice against the natives "infected the entire process" of fishery regulation. On May 27, 1983, the three Human Rights Commission members unanimously adopted the hearing officer's proposed decision as a final order. The state did not appeal the Commission's order, as it was entitled to do under AS 18.80.135.

Meanwhile, on March 13, 1981, the surf fishermen had filed a complaint in the superior court seeking "an injunction, damages, and other appropriate relief," pursuant to AS 18.80.255, 42 U.S.C. § 1983, and the fourteenth amendment to the federal constitution. In April 1984, after the Commission's order issued in the parallel case,[9] the state filed an amended answer in which it asserted nine affirmative defenses. The most important of these defenses invoked various theories of sovereign immunity, including state immunity from punitive dam-

---

**9.** Neither the record nor the briefs explain why the superior court action remained suspended while the Commission proceedings ran their course.

ages. The surf fishermen filed an amended complaint on January 2, 1986, adding a reference to the Commission findings, an allegation that surf fishing was "part of the heritage of Yakutat Alaska natives," and a new count based on article I, section 3 of the Alaska Constitution.

The surf fishermen next moved for partial summary judgment, arguing that the Commission's final order precluded relitigation of the state's liability under AS 18.80.255. The state, in turn, moved for summary judgment, arguing that sovereign immunity, state immunity from punitive damages, and state immunity from suit under 42 U.S.C. § 1983 barred the surf fishermen's claims.

The superior court denied, without comment, the surf fishermen's motion for partial summary judgment. The superior court also denied part of the state's motion for summary judgment, finding that the state was *not* immune from suit under the Alaska Civil Rights Act. The superior court, however, granted part of the state's summary judgment motion, holding that the state was immune from liability for punitive damages and that, as a "nonperson," the state was not subject to liability under 42 U.S.C. § 1983.

Accordingly, in November 1987, the parties proceeded to a five-week bench trial, before Judge Thomas M. Jahnke, on the remaining issues in the case. On May 3, 1988, Judge Jahnke issued a memorandum of decision in the case. In sum, the superior court found that the state's closures of the surf fishery constituted a facially neutral practice that had no disparate impact on the native fishermen because they were still "free to fish all the remaining open waters." On the other hand, the superior court found that a "facially neutral practice that *did* have a substantial discriminatory impact ... was the promulgation of the surf closures and restrictions without creating any mechanisms to resolve the conflicts between inriver and surf fishermen that were certain to occur." The superior court refused to find liability based on implied causes of action under the federal and state constitutions, but did find that the state had violated AS 18.80.255 of the Human Rights Act. The superior court further found that the surf fishermen had failed to show either the existence or extent of lost profit damages. Accordingly, the superior court awarded the surf fishermen only declaratory relief.

The surf fishermen have appealed nearly all of the rulings and findings and awards adverse to them in this case except the dismissal of their federal law claims. The state has cross-appealed on several points, most importantly on the superior court's ruling on sovereign immunity.[10]

## II

The superior court determined two questions of law before trial when it ruled on the parties' motions for summary judgment. Both determinations involved pure questions of law, and we review the superior court's decisions on those questions *de novo*.[11]

### A

Article II, section 21 of the Alaska Constitution provides that "[t]he legisla-

---

**10.** The state also has appealed the superior court's use of a disparate impact model of discrimination in the case, and the superior court's refusal to enter directed verdict for the state. Because of our disposition of other issues in the appeal, we do not reach either of these points in the cross appeal. As we note below, however, we in no way intend to endorse either the Commission's or the superior court's use of the disparate impact model of discrimination in this case. *See infra* note 22.

**11.** A grant of partial summary judgment is always reviewable on appeal when final judgment in a case comes after trial. *E.g., Currington v. Johnson,* 685 P.2d 73, 76–78 (Alaska 1984). De-

nials of summary judgment also may be reviewable on appeal when final judgment in a case comes after trial, but only if the facts applicable to the summary judgment ruling were not in dispute and the basis of the ruling is a matter of law. *Kentucky, Trans. Cabinet, Bureau of Highways v. Leneave,* 751 S.W.2d 36, 37 (Ky.App. 1988); *Shisler v. Fireman's Fund Ins. Co.,* 87 Or.App. 109, 741 P.2d 529, 532 (1987); *see also City of Fairbanks v. Schaible,* 375 P.2d 201, 206 (Alaska 1962); *City of Fairbanks v. Schaible,* 352 P.2d 129, 130–31 (Alaska 1960); *see generally* Annotation, *Reviewability of Order Denying Motion for Summary Judgment,* 15 A.L.R.3d 899, 902, 922–24 (1967).

ture shall establish procedures for suits against the state." In 1966, the legislature amended the Alaska Human Rights Act to include AS 18.80.255, which provides, in relevant part:

It is unlawful for the state or any of its political subdivisions

(1) to refuse, withhold from or deny to a person any local, state or federal funds, services, goods, facilities, advantages or privileges because of race, religion, sex, color or national origin; ....

Ch. 79, § 1, SLA 1966. In 1970, the legislature added a new subsection to AS 22.10.020, the statute that establishes the original jurisdiction of the superior court, to permit actions under AS 18.80 in the superior court:

The superior court is the court of original jurisdiction over all causes of action arising under the provisions of AS 18.80.... In an action brought under this subsection, the court may grant relief as to any act, practice or policy of the defendant which is prohibited by AS 18.80.... The court may enjoin any act, practice or policy which is illegal under AS 18.80 ... and may order any other relief, including the payment of money, that is appropriate.

AS 22.10.020(c), enacted by Ch. 240, § 1, SLA 1970 (currently AS 22.10.020(i)).

As the superior court noted when it denied summary judgment on this point, and as the surf fishermen argue on appeal, AS 18.80.255(1) and AS 22.10.020, taken together, appear to constitute express legislative consent for persons to bring particular civil rights actions against the state. We agree.

■ The state argues that, notwithstanding the consent to suit effect of the statutes quoted above, the extent to which the state may be liable under AS 18.80 ultimately depends upon application of yet another statute, AS 09.50.250.[12] This third statute establishes the general rule that "[a] person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in the superior court." AS 09.50.250. The statute also, however, establishes state immunity from a variety of particular claims, among which are claims "for tort ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused." AS 09.50.250(1). According to the state, the Department and the Board of Fisheries exercised their discretionary powers when they chose to close the surf fisheries from 1980 to 1983. Thus, goes the argument, AS 09.50.250(1) bars the surf fishermen's claim against the state. We reject this argument.

■ As we repeatedly have explained, "[s]tate liability is the rule; immunity is the exception." *Freeman v. State*, 705 P.2d 918, 920 (Alaska 1985). The legislature specifically provided for actions against the state in AS 18.80.255. The legislature also provided for recovery of damages, when appropriate, for state violations of AS 18.80. *See* AS 22.10.020. The general exceptions to state tort liability that the legislature established in AS 09.50.250(1) have no control over the specific

---

12. The state also argues that a fourth statute, AS 44.62.300, preempts any other action against the state's use of its regulatory powers. We find no merit in this argument. AS 44.62.300 establishes standing for any "interested person" to "get a judicial declaration on the validity of a regulation by bringing an action for declaratory relief in the superior court." AS 44.62.300. First, the Department's emergency order in 1980 "is not subject to the Administrative Procedure Act (AS 44.62)." AS 16.05.060(c). Second, the Board's regulations in subsequent years presumably are subject to challenge under AS 44.62.300. Such a challenge, however, might have alleged that the Board's regulations were invalid because they

violated AS 18.80.255. *See* AS 44.62.020 ("To be effective, each regulation adopted must be within the scope of authority conferred *and in accordance with standards prescribed by other provisions of law*.") (emphasis added). The surf fishermen did not make such a challenge, preferring instead to seek the remedies for violation of AS 18.80.255 that the legislature explicitly has made available under AS 22.10.020(i). The state does not argue that the legislature impermissibly provided concurrent bases for challenging illegal state discrimination. Thus, the state's invocation of AS 44.62.300 is irrelevant to this case.

consent to state liability under the Human Rights Act.[13] *Accord Marsh v. Department of Civil Serv.*, 142 Mich.App. 557, 370 N.W.2d 613, 619 n. 10 (1985) ("Suits against the state for employment discrimination pose no immunity from suit or liability problems since the state ... is subject to the provisions [of the state civil rights acts] which ... allow actions to be brought in the circuit courts for such discrimination."); *State, Dep't of Correctional Serv. v. State Div. of Human Rights*, 88 A.D.2d 1061, 452 N.Y.S.2d 746, 748 (1982) ("The Legislature, in enacting the Human Rights Law, has waived sovereign immunity to the extent of subjecting the State to the regulations of the law."). The superior court correctly denied the state's motion for summary judgment on this point.

**B**

■ The superior court found that although the state enjoyed no immunity from claims brought under AS 18.80 and AS 22.10.020(i), the state nevertheless *was* immune from liability for punitive damages. The surf fishermen argue that the superior court erred. We disagree with the surf fishermen on this aspect of sovereign immunity.

In *Loomis Elec. Protection Inc. v. Schaefer*, 549 P.2d 1341, 1343 (Alaska 1976), we held that "the broad language of AS 22.10.020(c) includes a legislative intent to authorize an award of compensatory and punitive damages for violations of AS 18.-80." We expressed no opinion in *Loomis*, however, on the specific question of the availability of punitive damages when the state has violated AS 18.80. We believe that the general authorization for damages awards in AS 22.10.020(c) is not sufficient to support an award of punitive damages against the state. On the contrary, government entities may be liable for punitive damages only pursuant to express and specific statutory authority. *See Richardson v. Fairbanks North Star Borough,*

705 P.2d 454, 456 n. 1 (Alaska 1985) (no punitive damages against municipality without statutory authorization). The superior court correctly determined that the state may not be found liable for punitive damages for violations of AS 18.80.

**III**

■ The superior court determined prior to trial that the Human Rights Commission decision and order should receive no issue preclusive (collateral estoppel) effect. The surf fishermen argue that the superior court erred as a matter of law on this point.[14] According to the surf fishermen, the Commission's decision and order became "binding" upon the state when the state failed to appeal that decision and order to the superior court. Thus, the surf fishermen argue, the superior court wrongly permitted the state to relitigate the underlying factual and legal issues actually litigated before the Commission hearing officer. We essentially agree with the surf fishermen's argument.

■ There are four basic requirements for the application of issue preclusion: the party against whom preclusion would work must have been a party, or in privity with a party, to the first action, *Rapoport v. Tesoro Alaska Petroleum Co.*, 794 P.2d 949, 951 (Alaska 1990); the issue to be precluded from relitigation must be identical to the issue decided in the first action, *id.;* the first action must have resolved the issue by final judgment on the merits, *id.;* and the determination of the issue must have been essential to the final judgment, Restatement (Second) of Judgments § 27 (1982). In Alaska, as in most jurisdictions, issue preclusion may apply to administrative adjudications. *Holmberg v. State, Div. of Risk Management*, 796 P.2d 823, 825 (Alaska 1990); *CFEC v. Byayuk*, 684 P.2d 114, 122 (Alaska 1984); *Jeffries v. Glacier State Tel. Co.*, 604 P.2d 4, 8–9 (Alaska 1979). But as we explained in

---

**13.** In other words, an action brought under AS 18.80 is not subject to the same rules as one brought under AS 09.50.250.

**14.** The superior court determined this legal issue by denying the surf fishermen's motion for summary judgment. We review the superior court's decision on this point *de novo*. *See supra* note 11.

*Holmberg, Byayuk* and *Jeffries,* a determination of the appropriate preclusive effect of administrative decisions is possible only on a case by case analysis. *Holmberg,* 796 P.2d at 825; *Byayuk,* 684 P.2d at 122; *Jeffries,* 604 P.2d at 8-9.

The question of issue preclusion in this case is somewhat complicated by the statutory scheme of the Human Rights Act. The legislature created concurrent original jurisdiction for actions involving violations of AS 18.80 in both the Commission and in the superior court. *Compare* AS 18.80.-060(a)(4) & (b)(3); 18.80.100; 18.80.120; 18.-80.130 (Commission jurisdiction, hearing procedure, etc.) *with* AS 22.10.020(i) (superior court jurisdiction). In an effort to coordinate this double jurisdiction, the legislature also specifically provided for the preclusive effect of the Commission's decisions in a few, critical circumstances.

The most important preclusion statute for present purposes is AS 18.80.145.[15] Section 145 requires a plaintiff who brings a superior court action under AS 18.80 to serve a complaint on the Commission. Section 145(a). The statute further provides authority for the Commission to intervene in the superior court action or to request the superior court to defer its proceedings

for up to forty-five days or such extended period as the court may allow. *Id.* The statute then states:

> If within the [deferral] period allowed the commission conducts a hearing and reaches a decision under AS 18.80.120 and 18.80.130, the decision of the commission is binding on the parties to the court action as to all issues resolved in the hearing but not as to any issues not resolved in the hearing.

*Id.* at (b).

In essence, AS 18.80.145 provides a mechanism by which the Commission and the superior court may avoid jurisdictional conflict over actions brought under AS 18.80. In the present case, because of the procedural pace of the two parallel actions, the Commission spent some two years processing, investigating, hearing, and deciding its action. In that time, the superior court action did not proceed beyond the initial pleading stage, and the Commission had no need to intervene or to request deferral under AS 18.80.145.[16] As a result, the language in § 145 that establishes the "binding" effect "of all issues resolved" in a Commission hearing does not apply directly to this case. No language in § 145, however, suggests that issue preclu-

---

**15.** Another statute addressing the question of preclusion provides that "[t]he acquittal of a person by the commission or a court of competent jurisdiction of any alleged violation of this chapter is a bar to any other action, civil or criminal, based on the same act or omission." AS 18.80.280. This statute establishes a type of claim preclusive effect for particular decisions under AS 18.80 adverse to the claimants or plaintiffs. We note that no statute specifically creates claim preclusive effects when the complainants or plaintiffs *prevail.* Indeed, when (as in this case) claimants before the Commission prevail, their claim does not merge into the favorable judgment. Rather, they are still free to bring subsequent action under AS 22.10.-020(i) (formerly (c)) in superior court, because the remedies available in court are different than those available before the Commission. *See* Restatement (Second) of Judgments § 83(3) (1982).

**16.** The state directs our attention to subdivision (d) of AS 18.80.145, which provides that "[i]f the commission does not intervene or file a certificate [*i.e.,* request court deferral] and conduct a hearing as provided in this section, the court

has complete jurisdiction of the case, notwithstanding the provisions of AS 18.80.280." The state argues that this language limits the preclusive effect of an agency decision to cases in which the Commission intervenes or requests superior court deferral. What AS 18.80.145(d), taken together with AS 18.80.280, means is that where the Commission does not intervene but acquits an alleged violator, that acquittal should not be given preclusive effect in court. This provision is favorable to victims of discrimination, as they are given a second chance in court. However, it would be reading too much into the term "complete jurisdiction" to infer the converse proposition that those found guilty by the Commission are also to be given a second chance in court. Issue preclusion, or more broadly, res judicata, is applicable only where there is dual jurisdiction, that is where two separate forums have complete jurisdiction. Where only one forum has the power to act the term "exclusive jurisdiction" is used. We therefore conclude that § 145(d) does not mean that issue preclusion is inapplicable to cases where the Commission does not intervene under § 145(a) but determines that discrimination has taken place.

sion can obtain *only* when the Commission has requested deferral. On the contrary, section 145 simply makes clear that Commission decisions and orders rendered within the deferral period must receive issue preclusive effect. Such a deferential scheme clearly suggests that the Commission's decisions should carry issue preclusive effect in an appropriate case. *See Holmberg*, 796 P.2d at 825.

 Of course, our general conclusion that the Commission's findings should carry preclusive effect when appropriate does not decide the concrete question of whether the superior court properly should have accorded preclusive effect to the particular Commission findings relevant here. The preclusive use of prior administrative findings must always be fair. *Byayuk*, 684 P.2d at 122. Fairness, at a minimum, requires that the administrative procedure entailed "the essential elements of adjudication." [17] *Id.; see also Holmberg*, 796 P.2d at 825 (citing 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4475, at 764–65 (1981)). Additionally, the doctrine of issue preclusion "is at its best as it applies to an adjudication of past facts, where the second proceeding involves the same claim or the same transaction." *Jeffries*, 604 P.2d at 9 (quoting 2 K. Davis, *Administrative Law Treatise* § 18.-03, at 559 (1958)). However, most courts accord the same preclusive effect to administrative adjudications of legal issues as they do to judicial adjudications of those issues. *E.g., Guild Wineries & Distiller-*

*ies v. Whitehall Co.*, 853 F.2d 755, 758–59 (9th Cir.1988); *Eilrich v. Remas*, 839 F.2d 630, 634 & n. 2 (9th Cir.1988); *see also* 4 K. Davis, *Administrative Law Treatise* § 21:2, at 49 (2d ed. 1983); Restatement (Second) of Judgments §§ 27 & 83 (1982).[18]

In this case, the Commission adjudicated and resolved numerous issues of law and fact that, if given preclusive effect, would have altered the superior court's entire approach to the case. The Commission's most notable factual finding was that Alex Brogle's "recommendations formed the basis for official actions, and his prejudice infected the entire process." This was, in essence, a finding that intentional discrimination against the surf fishermen on the basis of race played a significant part in the state agencies' decisions to regulate the surf fishery.[19] The Commission's most significant legal conclusion, of course, was that the state had discriminated against the surf fishermen because of race, and thus had violated AS 18.80.255.

 We conclude that a determination on each of these issues was essential to the Commission's decision. We also conclude that it would have been fair to accord those determinations preclusive effect. Regulations that govern the Commission's hearing and prehearing procedures clearly provide for the essential elements of adjudication.[20] Indeed, the state does not suggest that the proceedings before the Commission failed to provide a full and fair adjudication of the issues important here.[21] Moreover, examination of the hearing officer's remarka-

---

**17.** The essential elements of adjudication include adequate notice to persons to be bound by the adjudication, the parties' rights to present and rebut evidence and argument, a formulation of issues of law and fact in terms of specific parties and specific transactions, a rule of finality specifying the point in the proceeding when presentations end and a final decision is rendered, and any other procedural elements necessary for a conclusive determination of the matter in question. Restatement (Second) of Judgments § 83(2) (1982).

**18.** We also note that the statute in the Human Rights Act that addresses the issue preclusive effect of some Commission decisions states that parties shall be bound "as to *all* issues resolved in the hearing." AS 18.80.145(b) (emphasis added). The statute makes no distinction between issues of law and issues of fact.

**19.** The superior court, in contrast, found that Alex Brogle's racism did not significantly contribute to the state agencies' official actions.

**20.** *See, e.g.,* 6 AAC 30.415 (subpoena power); 6 AAC 30.430 (requirement of notice to parties); 6 AAC 30.440 (hearing procedures); 6 AAC 30.460 (rules of evidence); 6 AAC 30.470 (requirement of findings of fact and conclusions of law); 6 AAC 30.480 (provisions for final Commission order); *see also* 6 AAC 30.510–590 (discovery procedures).

**21.** The state does perfunctorily note that the Board of Fisheries was not originally named as a respondent in the proceedings before the Commission. The Board of Fisheries, however, was joined in the action before the hearing officer rendered her decision. Moreover, the

bly thorough decision indicates that adjudication of all important issues was exhaustive. The state could have appealed the Commission decision, but chose not to. Thus, following the reasoning of our prior cases in this area, we hold that the superior court erred by not according preclusive effect to the Commission's findings and conclusions. The superior court should not have addressed the question of the state's violation of AS 18.80.255.[22] The superior court should have focused solely on the

damages issues in the case that were not determined by the Commission, or that, if determined by the Commission, were not essential to the Commission's judgment.[23] *See Byayuk*, 684 P.2d at 122; *Jeffries*, 604 P.2d at 8–9; 4 K. Davis, *supra*, § 21:2 at 49; Restatement (Second) of Judgments §§ 27 & 83 (1982).

## IV

The parties in this case focused on the issue of special, economic damages for lost

---

record indicates that the state acquiesced to joinder of the Board of Fisheries because the joinder posed no threat of prejudice. And finally, the hearing officer's decision specifically bound the Board of Fisheries. The Board of Fisheries thus appears to have been a party to the Commission proceedings for purposes of application of issue preclusion. The state makes no express argument to the contrary.

22. Our decision on this point renders unnecessary a review of the state's argument that the superior court erred by analyzing this case under the disparate impact model. Our decision that the Commission's legal determinations should have received preclusive effect, however, in no way endorses either the Commission's conclusion or the superior court's conclusion that the disparate impact model of discrimination correctly applied in this case.

First, we have never approved the use of the disparate impact model outside the context of employment discrimination. *See Thomas v. Anchorage Tel. Util.*, 741 P.2d 618, 628–29 (Alaska 1987) (adopting disparate impact model for cases arising under AS 18.80.220). We recognize that courts and legislatures carefully have extended the use of the disparate impact model beyond the employment discrimination context. *See generally Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 666 & n. 9, 109 S.Ct. 2115, 2129 & n. 9, 104 L.Ed.2d 733 (1989) (Stevens, J., dissenting) (listing examples of congressional extension of disparate impact model); Maltz, *The Expansion of the Role of the Effects Test in Antidiscrimination Law: A Critical Analysis*, 59 Neb.L.Rev. 345, 357–62 (1980). But courts and legislatures also have limited use of the model. *E.g., General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389–91, 102 S.Ct. 3141, 3149–50, 73 L.Ed.2d 835 (1982); *Larry v. White*, 929 F.2d 206, 209 & n. 8 (5th Cir.1991); Minn. Stat.Ann. § 363.03(11) (West 1991) (state human rights act adopting use of disparate impact model for employment discrimination only). The issue, then, is problematic, and one that deserves much more consideration than either the Commission or the superior court afforded it in this case.

Second, on the specific facts of this case, the disparate impact model appears to have been

invoked inappropriately. This was the rarest of all discrimination cases: a case in which the complainants offered strong direct evidence of discriminatory intent. *See Wise v. Mead Corp.*, 614 F.Supp. 1131, 1134 (M.D.Ga.1985) ("It is difficult—if not impossible—for a plaintiff to produce direct evidence of discriminatory intent."). Cases in which the plaintiff adduces direct evidence of motive invoke an entirely different analysis than other cases. A defendant in such a case can only successfully defend by showing by a preponderance of the evidence that the same decision would have been reached even without the discrimination factor. *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1071 (11th Cir.1990); *Fields v. Clark Univ.*, 817 F.2d 931, 936 (1st Cir.1987). This analysis—or model—for cases in which direct evidence of discrimination is present finds its greatest development in employment discrimination cases. *E.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). However, courts actually imported the model from outside the employment discrimination context. *See, e.g., Fields*, 817 F.2d at 936; *see also Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977) (under constitutional version of the model, direct proof of discriminatory motive invokes strict scrutiny). Clearly, then, use of the direct evidence model is not limited in the same way that use of the disparate impact model may be limited.

23. In addition to their cause of action under the Human Rights Act, the surf fishermen attempted to assert in the superior court causes of action for damages under the state and federal constitutions. The superior court held that under the circumstances of this case, no implied constitutional cause of action was available. The surf fishermen have appealed only the superior court's ruling on their state constitutional claim. We agree with the superior court that the surf fishermen have not shown why an implied constitutional cause of action for damages against the state is either necessary or appropriate in this case. *Vest v. Schafer*, 757 P.2d 588, 598 & n. 38 (Alaska 1988); *see also King v. Alaska State Hous. Auth.*, 633 P.2d 256, 260–61 & n. 5 (Alaska 1981).

profits. It is not particularly clear whether the parties also tried issues of general, compensatory damages. The superior court concluded that the surf fishermen had failed to prove, with reasonable certainty, that they had suffered lost profits. The superior court's decision contains findings of fact related to the surf fishermen's claims for general damages. The superior court decision, however, does not contain any express conclusion as to the availability of general compensatory damages nor does it expressly deny them to the surf fishermen.

"[A] determination of damages by the trial court is a finding of fact which will not be disturbed on appeal unless clearly erroneous." *State v. Guinn*, 555 P.2d 530, 544–45 (Alaska 1976). We have reviewed the record in this case and, we do not find clear error in any of the superior court's factual findings. However, we do not limit our review of the superior court's damages decision to simply an evidentiary review. "[T]his court will also intervene when the trial court's calculations are in disregard of a rule of law pertaining to damage measures." *Id.* at 545. In the present case, we find that the superior court improperly applied the law governing lost profits damages and general compensatory damages. We review each error in turn.

### A

Obviously, the superior court's authority to order any relief for violations of AS 18.80, "including the payment of money" encompasses the authority to award special damages for lost profits. AS 22.10.020; *see also Loomis*, 549 P.2d at 1343. We previously have held that damages for lost fishing profits, although impossible to prove with mathematical precision, are recoverable if proved with "reasonable certainty." *Williams v. Eckert*, 643 P.2d 991, 996 (Alaska 1982) (quoting *Reefer Queen Co. v. Marine Construction & Design Co.*, 73 Wash.2d 774, 440 P.2d

448, 452–53 (1968)). Reasonable certainty requires a showing of actual loss of profits and a reasonable basis upon which to compute an award. *Id.; see also Alaska Children's Serv., Inc. v. Smart*, 677 P.2d 899, 902 (Alaska 1984) ("Generally, once the existence of lost profits is established, the actual amount need not be proven exactly."). The superior court explicitly found that the surf fishermen had failed to show either that the state's acts or omissions caused them any lost profits or the extent of any lost profits. We disagree.

The state concedes that it restricted access to the surf fisheries in order to prevent fishermen, including the plaintiffs, from catching as many salmon as they otherwise would have caught. This case is controlled by the Commission's determination that the state's restrictions illegally discriminated against the surf fishermen. Thus, any fishing profits that the surf fishermen would have earned if the state had not illegally discriminated against them are, if proved, recoverable. Accordingly, any surf fishermen who can show that he would have fished in the restricted areas during the illegally restricted periods has proved the bare fact of actual lost fishing opportunity. The only remaining question is whether there is a reasonable basis upon which to calculate the extent to which lost opportunity caused lost profits.[24]

As we explained in *Williams*, we will not deny recovery unless the best available evidence on damages provides "no possibility of a reasonably proximate estimation" of lost fishing profits. *Williams*, 643 P.2d at 996 (quoting *Pacific Steam Whaling Co. v. Alaska Packers Ass'n*, 138 Cal. 632, 72 P. 161, 163 (1903)). In the present case, the surf fishermen's expert witness offered alternative methods for gauging the amount of fish that the surf fishermen would have caught if the surf fishery had not been closed. The superior court rejected both of the expert's

---

**24.** *See Williams*, 643 P.2d at 995 (detention of plaintiff's boat for part of the fishing season left only question of reasonable basis for calculation of damages); *West v. Whitney–Fidalgo Seafoods, Inc.*, 628 P.2d 10, 17 (Alaska 1981).

methods as unreliable. We agree with this aspect of the court's decision.

Using his first method of gauging lost profit, the surf fishermen's expert calculated the percentage of the total fishery catch in 1979 that the surf fishermen took[25] and then attributed the remaining percentage to the inriver fishermen. The expert then assumed that the inriver fishermen caught similar percentages of the available catch in the years 1980 to 1983. From those projections, the expert estimated the catch that the surf fishermen *would* have taken during the period from 1980 to 1983. The product of that calculation was an aggregate loss of $1,070,091. The expert's second method of estimating damages began with the assumption that the inriver fishermen took *all* of the available harvest in 1980–83. The expert then multiplied the inriver totals from 1980–83 by the percentage of total harvest that the surf fishermen took in 1979. The product of that calculation was $688,814.

■■■■■ The superior court had a variety of reasons for rejecting both of the expert's projections.[26] We find the following rationale dispositive: The salmon runs, the size of permissible gear, the length of season openings, and the total number of fishermen at the surf and inriver fisheries all fluctuated from 1979 to 1983. Consequently, the percentage of total harvest that the surf fishermen took in 1979 has no rational correlation to the percentages of the total that they would have taken in the surf from 1980 to 1983. We thus find no error in the superior court's decision to reject the surf fishermen's calculations of aggregate lost profits.

The superior court's decision to reject the surf fishermen's individual showings of lost profits, however, is not as convincing. It is in this aspect of the decision that the superior court improperly ignored "a rule pertaining to damage measures." *Guinn*, 555 P.2d at 545.

■■■■■ When the crux of a case is that the defendant's acts prevented the plaintiff from fishing during a definite period in certain waters, the harvest that other fishermen took during that period in those waters may provide a reasonable basis upon which to determine an individual plaintiff's loss. *See Williams*, 643 P.2d at 996; *West v. Whitney–Fidalgo Seafoods, Inc.*, 628 P.2d 10, 17 (Alaska 1981). Similarly, the plaintiff's own harvests in the period proximate to the lost time period may provide a reasonable basis to establish lost profits. *See Williams*, 643 P.2d at 995–96. Naturally enough, both types of evidence may work together to provide a reasonable calculus. *See id.; Reefer Queen*, 440 P.2d at 451–53. Evidence of prevailing conditions[27] (*i.e.*, the numbers of fish available for harvest, the probable effect of intervening weather, the impact of increased competition, the competence of the plaintiff or crew seeking damages etc.) also may play a part in such a calculation. *E.g.*, *Williams*, 643 P.2d at 995–96; *Berg v. General Motors Corp.*, 87 Wash.2d 584,

25. The Department of Fish and Game's records first separated surf and inriver harvests in 1979.

26. One of the superior court's objections to the surf fishermen's second estimate of total damage was that the expert included no account of the plaintiff's mitigation of damages in 1980–83. The court's application of the law was clearly wrong on this point. It is true that "a wronged party must use reasonable efforts to avoid the consequences of injury done by another." *University of Alaska v. Chauvin*, 521 P.2d 1234, 1239 (Alaska 1974); *see also Alaska Children's Services*, 677 P.2d at 902; *West*, 628 P.2d at 18. However, the question of mitigation is entirely independent of the damages question. *See Alaska Children's Services*, 677 P.2d at 902. In this case, analysis of the surf fishermen's proof of damages—both in fact and in extent—is the first step. Only after determining damages does the court reduce the damages amount according to the state's proof of mitigation or failure to mitigate. *See id.* at 901–02.

27. One important condition in this case is the need for fishing restrictions. No one disputes that the state had good reason to restrict fishing in general on the Alsek and East Alsek after 1979, so long as the restrictions were not illegally discriminatory. For the purposes of a reasonable calculation, then, the superior court may assume that a nondiscriminatory surf restriction would have paralleled the inriver restriction. In other words, the superior court feasibly may calculate lost profits according to what the surf fishermen would have made if the surf had been open for them to fish during the same periods that the inriver sites were open.

555 P.2d 818, 824–25 (1976); *Reefer Queen,* 440 P.2d at 451. And finally, while most of the cases on this point involve lost fishing time as a result of harm to, or detention of, a vessel, the same principles apply when the plaintiff loses fishing time because of wrongful exclusion from fishing grounds. *Williams,* 643 P.2d at 996 (citing *Pacific Steam Whaling Co. v. Alaska Packers' Ass'n,* 138 Cal. 632, 72 P. 161 (1903)).

As the superior court's findings of fact show, most of the surf fishermen presented precisely the sort of evidence that courts generally find sufficient to support an award for lost fishing profits. The superior court's findings of fact in regard to the surf fishermen's activity in the East Alsek surf fishery during the restricted years is particularly thorough. The court found that every surf fisherman fished at least one year between 1980 and 1983 during the restricted opening at the East Alsek river. At least three surf fishermen fished there during every season between 1980 and 1983.[28] Because the Alsek's surf fishery was more stringently restricted than the East Alsek's, few surf fishermen worked at the Alsek between 1980 and 1983 and the superior court's findings are less definite. The superior court did find that ten of the thirteen surf fishermen actually fished in the Alsek surf in 1980, during the limited time that the fishery was open.[29] After 1980, however, it appears that very few surf fishermen attempted to exploit the restricted open area and time at the Alsek surf.[30]

Taking the easiest problem of calculation first, along with other factors, the superior court could have calculated an individual's lost catches on days of discriminatory closure in a given year according to that individual's actual catches on days when the particular fishery was open in that year. *Cf. Williams,* 643 P.2d at 995–96. Upon remand, then, the superior court shall reexamine the present record and employ each surf fisherman's individual proof of surf harvest during any given year as a basis for calculating lost profits for that year.

A closer question is whether the superior court also should use the harvests of fishermen who worked in the surf from 1980 to 1983 as the basis to calculate lost profits in any given year for those plaintiffs who did not fish in the surf in that year. As noted, the harvest that other fishermen take during a definite period in particular waters may provide a reasonable basis upon which to determine lost fishing profits for the same period and waters. *See Williams,* 643 P.2d at 996. Additionally, we note that some of the surf fishermen testified that they did not bother to fish the surf at the Alsek river mouth during the years of closure because they did not know the area was open to fishing. The superior court's analysis of this theory of damages is both incomplete and incorrect.[31]

We conclude that, upon remand, the superior court must scrutinize the record for evidence relevant to the lost profit claims

---

**28.** The three are Sheldon James, Daryl James, and Myron Johnson.

**29.** The superior court found that Russell Bogren and Eli Hanlon did not fish in the surf at the Alsek in 1980. While evidence as to Bogren's presence at the Alsek in 1980 was conflicting, we cannot say that the court clearly erred in deciding as it did.

**30.** The court found that Sheldon James fished the Alsek surf in 1980–82, and that his brother Daryl "fished essentially the same openings."

**31.** As an example of an incorrect inquiry, when addressing plaintiff Daryl James' claim of lost profits the superior court wrote: "In 1982 and 1983, Daryl James did not fish the Alsek and the preponderance of the evidence does not show that he would have made more than the expenses he did not incur by staying away." The

correct inquiry should have been whether James would have made more than his expenses if the surf fisheries had not been discriminatorily restricted.

The superior court also generally overlooked the significance of a plaintiff's choice not to waste his time trying to fish the restricted waters. For example, when addressing Clarence and Bill Milton's claim of lost profits, the superior court simply wrote: "They did not sell any Alsek fish after 1980, concentrating instead on the Situk and East [Alsek] rivers in 1981 and 1982. From this record of catches, the court cannot find with reasonable certainty that the Miltons were damaged as a result of the surf closure at the Alsek River." The superior court here obviously ignores the possible methods of calculation available.

of surf fishermen who chose not to fish in either of the two discriminatorily closed fisheries because of the discriminatory closures. If the superior court finds that the state's discriminatory restrictions constituted a cause of the choice not to fish at all in a given season or opening, then the court shall calculate, as appropriate, lost profits damages for those fishermen based upon the actual catches of fishermen who worked during the same periods in the same fishery. *Cf. Williams*, 643 P.2d at 996; *see also West*, 628 P.2d at 17 (approving calculation of lost fishing profits based on nearby catches in same period). The court, if necessary, may calculate an average actual catch and assign it to those who did not fish. The court also may consider evidence tending to show the skill and capability of each individual in relation to others when making these calculations.

▪ Finally, we must consider whether the superior court has any basis on which to calculate lost profits due to the Alsek surf restrictions during 1983, when no surf fisherman exploited the area. Initially, we are loath to deny recovery for that season simply because the state's discriminatory closures were so effectively daunting to the surf fishermen. To do so would ignore settled principles of damage measure. *See* C. McCormick, *Handbook on the Law of Damages* § 27(b), at 101 (1935) ("Where the defendant's wrong has caused the difficulty of proof of damage, he cannot complain of the resulting uncertainty."). More important, however, to do so would countermand the legislative intent to provide complete relief for violations of AS 18.80. *Loomis*, 549 P.2d at 1343 (citing AS 22.10.-020).

As noted, the best proof available on the Alsek surf fishery comes from 1980, when ten surf fishermen worked there. We have held that the unlawfully restricted catches of that year may provide the basis for determining what lawfully restricted catches would have been that year. We also hold that the catches of that year may provide the basis for determining what the catches would have been in 1983.[32]

## B

▪ Under most state antidiscrimination or civil rights statutes, compensatory damages awards may include actual damages for mental anguish.[33] Such mental anguish damages, as creatures of statute, are entirely distinct from damages for emotional distress available under common law tort theories, which normally require a showing of extreme mental injury. *E.g., Dean v. Municipality of Metropolitan*, 104 Wash.2d 627, 708 P.2d 393, 400–01 (1985); *Chomicki v. Wittekind*, 128 Wis.2d 188, 381 N.W.2d 561, 566–67 (App.1985) (noting that plaintiff had not satisfied common-law tort requirement of "extreme disabling emotional response" but affirming

---

**32.** Any such calculation, of course, is also subject to all qualifying principles that we have mentioned in connection with the measure of damages at the East Alsek surf fishery or at the Alsek surf fishery in 1980–82.

**33.** *E.g., Mitchell v. Seaboard Sys. R.R.*, 883 F.2d 451, 453 (6th Cir.1989) (statutory provision for "actual damages" authorized compensatory damages for mental anguish) (Kentucky law); *Ridenour v. Montgomery Ward & Co.*, 786 F.2d 867, 869 (8th Cir.1986) (same) (Iowa law); *Cripps v. United Biscuit of Great Britain*, 732 F.Supp. 844, 846–47 (E.D.Tenn.1989) (same) (Tennessee law); *Brewster v. Martin Marietta Aluminum Sales, Inc.*, 145 Mich.App. 641, 378 N.W.2d 558, 568–69 (1985) (mental anguish damages available in court action); *State ex rel. Cooper v. Mower County Social Serv.*, 434 N.W.2d 494, 499–500 (Minn.App.1989) (administrative agency empowered by statute to award actual damages and mental anguish damages); *Andersen v. Exxon Co.*, 89 N.J. 483, 446 A.2d 486, 496 (1982) (affirming administrative civil rights agency award of mental anguish damages); *State, Div. of Human Rights v. County of Onondaga Sheriff's Dep't*, 127 A.D.2d 986, 513 N.Y.S.2d 68 (1987) (affirming administrative human rights agency award of mental anguish damages but reducing award by 50%), *aff'd* 71 N.Y.2d 623, 528 N.Y.S.2d 802, 524 N.E.2d 123 (1988); *Dean v. Municipality of Metropolitan*, 708 P.2d 393, 400–01 (1985) (affirming jury instruction that included mental anguish as aspect of "actual damages" available under state antidiscrimination statute); *Chomicki v. Wittekind*, 128 Wis.2d 188, 381 N.W.2d 561, 566–67 (App. 1985) (affirming jury award of mental anguish damages under state antidiscrimination law and relying, in part, on availability of mental anguish damages in federal actions under the Fair Housing Act and the Civil Rights Act of 1866).

award of mental anguish damages because plaintiff brought action under state antidiscrimination statute, not under common-law theory).

■■■ Examination of the Human Rights Act and of our cases interpreting the Act make it clear that damages for mental anguish are available in Alaska as a form of compensatory damages under AS 22.10.020. Under the Act, the Commission's powers to remedy violations of AS 18.80 are quite specific. In all cases, the Commission may "order the person to refrain from engaging in the discriminatory conduct." AS 18.80.130(a). In employment discrimination cases, the Commission may order "any appropriate relief, including but not limited to" reinstatement and backpay. AS 18.80.130(a)(1). And in housing discrimination cases, the Commission may order the sale, lease or rental of housing to the complainant and, also, "may award actual damages." AS 18.80.-130(a)(2). In all cases, however, the Commission's power to award money is limited to special damages or to money payments incident to equitable relief,[34] that is, to damages for "direct, calculable pecuniary loss, such as back pay or housing expenses." *McDaniel v. Cory,* 631 P.2d 82, 88 (Alaska 1981).

In contrast, AS 22.10.020(i) (formerly subdivision (c)), provides that the superior court "may enjoin any act, practice or policy which is illegal under AS 18.80 ... *and may order any other relief, including the payment of money, that is appropriate.*" (Emphasis added.) Plainly, the remedial powers that this statute grants to the superior court are broader than the specific powers that AS 18.80.130 grants to the Commission. Indeed, the extraordinary difference between remedies available before the Commission and remedies available before the court provides the only rational reason for affording complainants' new action in superior court *after* they have prevailed before the Commission. *See, e.g.,* AS 18.80.145.

We held in *McDaniel* that the *Commission* could not award damages for pain and suffering. *McDaniel,* 631 P.2d at 86–88. We then added, "should the complainant wish to recover damages from the respondent, recourse to the courts is always available." *Id.* at 88. In *Loomis,* we explained that when complainants took recourse in the courts for violations of AS 18.80, among the full range of remedies available to them would be awards of general compensatory damages. *Loomis,* 549 P.2d at 1343. We wrote:

> The language of [AS 22.10.020(c)] is clearly intended to provide a litigant complete relief in an appropriate case. In view of the strong statement of purpose in enacting AS 18.80, and its avowed determination to protect the civil rights of all Alaska citizens, we believe that the legislature intended to put as many "teeth" into this law as possible. We fail to see how, consistent with that purpose and intent, the legislature could have contemplated a statutory scheme that would not have included the right to recover damages. Otherwise, there would be many cases in which no meaningful relief would be available to the injured party, the one whose civil rights have been violated and whom the law seeks to protect. We believe that the broad language of AS 22.10.020(c) indicates a legislative intent to authorize an award of compensatory and punitive damages for violations of AS 18.80, in addition to the equitable remedies such as enjoining illegal employment activities and ordering back pay as a form of restitution.

*Id.* (footnotes omitted). In *Loomis,* we also indicated in dicta that among the compensatory damages available for violations of AS 18.80 are damages "to redress mental suffering and other intangible injuries." *Id.* at 1344 n. 12 (quoting Comment, *Implying Punitive Damages in Employment Discrimination Cases,* 9 Harv.C.R.-C.L.L.Rev. 325, 336 (1974)). We apply that rule today. We also clarify it.

---

**34.** *See Loomis,* 549 P.2d at 1343 & n. 9 (noting that federal courts "have characterized back pay

as an integral part of an equitable remedy, a form of restitution").

As we noted in *McDaniel*, some states permit the administrative commissions charged with enforcing civil rights statutes to award compensatory damages. *McDaniel*, 631 P.2d at 87–88. Other states permit only the courts to award such damages. *See id.* at 88 (citing *Iron Workers Local No. 67 v. Hart*, 191 N.W.2d 758, 767–68 (Iowa 1971)). Generally, however, all of these states limit recovery of compensatory damages for mental anguish to "actual damages"—that is, to "all those damages directly and naturally resulting, in the ordinary course of events, from the injury in question." *Mitchell v. Seaboard Sys. R.R.*, 883 F.2d 451, 453 (6th Cir.1989); *accord Brewster v. Martin Marietta Aluminum Sales, Inc.*, 145 Mich.App. 641, 378 N.W.2d 558, 569 (1985).

We agree that compensatory damages for mental anguish caused by discrimination must be limited to actual damages. We also stress that such damages are not to be presumed. *See State v. Haley*, 687 P.2d 305, 320–21 (Alaska 1984), (presumptive damages are not available for violations of civil rights); *Cullen v. Nas-*

sau County Civil Serv. Comm'n, 53 N.Y.2d 492, 442 N.Y.S.2d 470, 473, 425 N.E.2d 858 (1981) (no mental anguish damages "solely upon finding that a discriminatory act occurred"). A complainant's own testimony may establish the fact and the quantum of damages. *Cullen*, 442 N.Y.S.2d at 473, 425 N.E.2d 858. But the amount of mental anguish damages assessed must specifically compensate only the injury proved.[35] *Id.*

The surf fishermen's complaint in this case requested general compensatory damages, and the surf fishermen's proof at trial included evidence that the state's violation of AS 18.80.255(1) had caused at least some of the surf fishermen mental anguish. Walter Johnson formally presented evidence that he suffered emotional injury as a result of the state's actions. Other surf fishermen less formally offered evidence that they suffered emotional injury. For example, Sheldon James testified that the closure of the Alsek surf fishery in 1980 surprised, angered, and upset him. He also testified that circum-

---

**35.** The damage awards for mental anguish, stripped of all punitive component, generally are quite moderate in amount. *E.g., Mitchell*, 883 F.2d at 453–54 (affirming award of $7,500 mental anguish damages under state law where plaintiff drove 20,000 extra miles per year to work at remote locations in an attempt to avoid a racially-biased supervisor); *State ex rel. Cooper v. Mower County Social Serv.*, 434 N.W.2d 494, 499 (Minn.App.1989) (affirming "administrative law judge's $2,000 award for mental anguish and suffering ... based on findings 'showing the turmoil experienced by [complainant] after her [discriminatory] rejection for employment'"); *Department of Human Rights v. Spiten*, 424 N.W.2d 815, 819 (Minn.App.1988) (affirming award of $3000 mental anguish damages to woman and her two children for the pain they suffered when refused an apartment because of their race); *Andersen*, 446 A.2d at 496 (affirming "moderate $500 award for emotional distress" plaintiff suffered when refused a job because of his disability); *Gray v. Serruto Builders, Inc.*, 110 N.J.Super. 297, 265 A.2d 404, 407, 415–16 (1970) (noting that the plaintiff, a man denied an apartment because of his race, was a person of substantial accomplishment and personal strength, and awarding only $500 mental anguish damages); *In re Anchor Motor Freight, Inc.*, 119 A.D.2d 672, 500 N.Y.S.2d 800, 801 (1986) (affirming administrative agency award of $5,000 mental anguish damages where

employer ignored Jewish employee's request to have days off for Sabbath and Holy Days and ordered him to work); *Board of Education v. McCall*, 108 A.D.2d 855, 485 N.Y.S.2d 357, 358 (1985) (affirming administrative agency award of $5,000 mental anguish award where employer discriminatorily denied complainant promotion because of gender); *Weiss v. State, Human Rights Appeal Bd.*, 102 A.D.2d 471, 477 N.Y.S.2d 342, 345 (1984) (holding that administrative agency abused discretion by not awarding mental anguish damages where employer discriminatorily denied complainant promotion because of gender and awarding $1,000); *Chomicki v. Wittekind*, 381 N.W.2d 561, 565–67 (Wis. App.1985) (affirming awards of $1,500 economic damages, $7,500 emotional distress damages, and $10,000 punitive damages where landlord treated tenant "as a sexual chattel ... and forced [plaintiff] to relocate in middle of winter along with her young children").

In fact, the only relatively large award for mental anguish damages under a state antidiscrimination law that we have found was reduced by 50% on appeal because the appellate court found it "grossly excessive." *County of Onondaga Sheriff's Dep't*, 513 N.Y.S.2d at 68 (reducing award of $30,000 mental anguish damages to $15,000 where record did not reveal how long complainant suffered depression or other effects after her discriminatory discharge from employment).

stances surrounding the surf closure—for example, the more lenient restrictions on inriver fishermen and the insulting manner in which Alex Brogle explained the state's action to the surf fishermen—convinced him of the racial animus behind the restrictions. Our examination of the record reveals similar testimony from several of the surf fishermen. Yet, the superior court failed to address the question of actual mental anguish damages.

We are mindful that the surf fishermen have not extensively, perhaps even competently, briefed the question of mental anguish damages.[36] Nonetheless, we consider their general point on appeal challenging the superior court's damage award, in combination with the argument in their brief, sufficient to warrant our ruling on the issue. *See Ratcliff v. Security Nat'l Bank,* 670 P.2d 1139, 1141 n. 4 (Alaska 1983). On the other hand, the surf fishermen do not argue that the superior court denied them an opportunity to introduce evidence of mental anguish injury. And, as noted, we find that the surf fishermen did adduce substantial evidence of such injury at the bench trial. Hence, we do not remand for a new trial on this question. Rather, upon remand, the superior court shall determine from the present record whether or not any of the plaintiffs tried the issue of mental anguish damages and, if so, whether such damages were proven.

The judgment of the superior court is AFFIRMED in part, REVERSED in part and MODIFIED in part, and this case is REMANDED for a redetermination of damages based on the present record.

---

**36.** The surf fishermen argue that the trial court should have awarded them damages for "lost heritage." The surf fishermen, however, articulate what amounts to a presumptive basis for measuring such an award. The surf fishermen are Native Alaskans denied access to the Alsek and East Alsek surf, and surf fishing, according to the Commission decision in the case, is part of the native heritage. Those facts alone, however, do not establish that the surf fishermen suffered "lost heritage" injury. Insofar as any individual plaintiff has shown that part of the mental anguish he suffered was related to his sense of "lost heritage," such loss might enter into the trial court's consideration of actual mental anguish damages. The superior court, however, properly will ignore the surf fishermen's aggregate claim for lost heritage damages. *See Haley,* 687 P.2d at 320–21.